Filed 5/11/21  P. v. Rosas CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL DEJESUS ROSAS,<br><br>    Defendant and Appellant. | H046320<br>(Santa Cruz County<br> Super. Ct. No. WF00933) |

Defendant Manuel DeJesus Rosas was convicted by a jury of second degree murder (Pen. Code, § 187, subd. (a))[1] and attempted murder (§§ 664, 187, subd. (a)).  As to both counts, the jury found true a firearm enhancement (§ 12022.53, subds. (d) & (e)) and a gang enhancement (§ 186.22, subd. (b)).  The trial court sentenced defendant to prison for a term of 19 years consecutive to a term of 65 years to life.

On appeal, defendant argues:  (1) section 186.22 is unconstitutionally vague and overbroad because it does not define the term "members"; (2) the prosecution's use of certified conviction records to prove predicate offenses under section 186.22 violated his constitutional right to confront witnesses; (3) the use of one of his prior offenses as a predicate offense was an ex post facto violation; (4) the trial court erred when it denied his discovery motion seeking all prior activities of the informant witnesses used by the prosecution; (5) the trial court erroneously excluded defense expert testimony on the

---

[1] Unspecified statutory references are to the Penal Code.

psychological impact and effect of accomplice and informant testimony; and (6) there was insufficient evidence to support his convictions because the evidence against him consisted of uncorroborated accomplice testimony. As we explain, we find no merit in his contentions and affirm the judgment.

## BACKGROUND

### 1. *The Information and Defendant's First Trial*

On March 16, 2011, defendant was charged by information with murder (§ 187, subd. (a); count 1), attempted murder (§§ 664, 187, subd. (a); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3). The information alleged that as to counts 1 and 2, the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and that a principal used and personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subds. (b)-(d), (e)(1).) A jury convicted defendant of all three counts, and the trial court sentenced him to a total term in prison of 94 years and eight months to life. Defendant appealed, and on November 16, 2016, this court reversed the judgment after we concluded that the trial court erred by permitting gang experts to testify about statements made by a nontestifying gang member under *People v. Sanchez* (2016) 63 Cal.4th 665, and the error was not harmless beyond a reasonable doubt. (*People v. Rosas* (Nov. 16, 2016, H038879) [nonpub. opn].) The matter was retried in 2018.

### 2. *The Second Trial*

#### A. *Overview of the Crimes*

On May 13, 2005, W.M. was shot and killed in a drive-by shooting on Palm Avenue in Watsonville. W.M.'s friend, D.A., was also shot, but he survived. The prosecution theorized that W.M.'s murder was the result of an ongoing gang war between two Norteño gangs, City Hall and Northside Watsonville, and that defendant, a City Hall gang member, shot D.A. and W.M. as retaliation. The prosecution alternatively argued

2

that if defendant was not the actual shooter, he was the driver of the car and was guilty as an aider and abettor.

## B. Defendant's Prior Contacts with the Police

In February 2005, Watsonville Police Department Sergeant Eric Montalbo was driving when he saw defendant parked in a burgundy Yukon sports utility vehicle (SUV). Sergeant Montalbo saw that there were three other known City Hall gang members inside the SUV. Additional officers arrived, the individuals were taken out of the car, and the officers found a loaded handgun on the SUV's passenger seat. Defendant was arrested and charged with possession of a loaded firearm in a vehicle.

In March 2005, Sergeant Montalbo stopped defendant again while he was driving in a burgundy Yukon. The stop was recorded on a video from Sergeant Montalbo's patrol car.

On May 7, 2005, Sergeant Montalbo went to defendant's house to perform a probation search. Inside the house, officers found several City Hall gang members, including Emanuel Rodriguez and Dennis Moreno. Defendant was arrested on a warrant, and the other individuals, with the exception of Moreno, were arrested for either parole or probation violations.

## C. The Murder

In 2005, 17-year-old D.A. was best friends with 18-year old W.M.[2] D.A. noticed that W.M. associated with people who wore red, which D.A. linked to gang activity, but D.A. did not think that W.M. was involved with gangs. W.M. sold drugs, including marijuana and methamphetamine.

---

[2] D.A. was 29 years old at the time of defendant's trial in 2018, and he testified that W.M. was about a year older than him.

3

On May 13, 2005, D.A. was at W.M.'s house on Palm Avenue. D.A. and W.M. walked to E.A. Hall Middle School, which was around two blocks away from W.M.'s house. W.M. used a bicycle as a wheelchair because he was recovering from a broken leg. D.A. and W.M. met with friends at the school. The group smoked marijuana and tobacco and talked about going to a party. D.A. and W.M. decided not to go to the party and walked back toward W.M.'s house around dusk.

D.A. and W.M. went down Palm Avenue. At a certain point, W.M. started riding his bicycle on the street while D.A. walked on the sidewalk. As D.A. and W.M. passed Minty White School, D.A. saw a burgundy or red SUV come down Palm Avenue. D.A. saw that the SUV driver was a "[b]ig Hispanic guy with a red shirt and facial tattoos." D.A. recalled that the driver had tattoos above his eyebrows that "made his eyebrows look big." The driver looked to be in his mid-20s or early 30s.

The burgundy SUV pulled up next to W.M., who was about eight or 10 feet in front of D.A. The SUV's front passenger window was open, and the window was parallel to where W.M. was on his bicycle. W.M. looked like he was going to smile, and he had a frown on his face and lifted his chin up. D.A. saw the SUV driver reach down toward the car's center console area, and he briefly saw the barrel of a silver-colored gun. The barrel went away, and D.A. heard gunshots. D.A. did not see a gun come outside the passenger window, and it looked like the gun was fired from inside the car.

D.A. ran forward and was shot. D.A. stopped when he saw W.M. W.M. gave D.A. a "head nod," indicating that D.A. should "get down." D.A. turned around, dove, and tried to crawl over to W.M. D.A. could see the car's front passenger, and he remembered that the passenger had an arm tattoo. He also remembered that the

4

passenger had a gun that was black and "square."[3]  The passenger did not shoot his gun. D.A. heard W.M. calling for his mother.  D.A. was shot through his lower left side, and the gunshot went through his testicles and into his leg down to his knee.  After the shooting, the SUV sped away.

D.A. testified that earlier that night, W.M. had said that he had some concerns because he had "shorted" somebody on a drug deal.  After W.M. was shot, D.A. remembered seeing one of their friends, Luis, touch W.M.'s body.  D.A. thought that Luis was checking to see where W.M. was shot.[4]

D.A. remembered that he spoke to an officer while he was injured at the scene. D.A. testified that he told the officer that he could not give any details about who was in the car, but the car was a red or burgundy SUV.

San Benito Sheriff's Office Captain Eric Taylor testified that he spoke to D.A. at the scene.  Captain Taylor recalled asking D.A., " 'Who did this?' "  D.A. replied, " 'I don't know.' "  W.M. died at the scene before he could make any statements.

Watsonville Police Department Officer Juan Rocha was also dispatched to the scene.  When Officer Rocha arrived, he saw D.A. lying on the ground.  Officer Rocha asked D.A. what happened.  D.A. said that a red or burgundy Suburban-type SUV had driven past him and W.M.  The car turned back and pulled up next to them, and D.A. heard someone say, " 'What's up, fools?' "  D.A. then heard gunshots.  D.A. said that he never saw a gun, and he did not see anyone inside the car.

---

[3] D.A. told officers about the passenger's gun in 2009, four years after the murder. He did not mention the passenger's gun during his interview on the night of the murder.

[4] In an earlier interview with officers, D.A. said that he saw Luis take something from W.M.'s body, but he could not see what was taken.

### D. Witnesses Seeing a Burgundy SUV on May 13, 2005

Around dusk on May 13, 2005, N.M. was in a car with his father and a friend when a burgundy SUV cut them off. N.M.'s father thought it would be a good idea to "call in [the] reckless driving" because the car "skid[ded] out a little bit" when it cut them off, and they were in a residential neighborhood. After they arrived at N.M.'s house, N.M. heard some "popping noises," and a few seconds later, the same burgundy SUV accelerated by.

J.C. saw a burgundy "Suburban or a GMC" drive recklessly by her house near Palm Avenue on the day of the shooting. One of the car's tires on the driver's side hit the curb near J.C.'s house and the car continued driving. J.C. could tell that there were multiple people inside the car.

J.R. lived on Palm Avenue and heard gunshots sometime around 8:00 or 8:30 p.m. that evening. Once she heard the gunshots, J.R. went to her front door window and looked outside. She saw a car quickly coming down the street on Palm Avenue. The car looked like it was a dark-colored "SUV-type vehicle."

### E. Identification of Defendant as a Suspect

D.A. was taken to a hospital after he was shot. At the hospital, D.A. told an officer that a red or burgundy SUV had been involved with the shooting, and the driver wore a red shirt and a black baseball cap. Several days after W.M.'s murder, officers came to D.A.'s house and showed him several photo lineups. D.A. was unable to identify anyone in the lineups. D.A. was later able to give W.M.'s mother a description of the driver. D.A. told W.M.'s mother that the driver was an "[o]verweight male, pretty heavy, red shirt" with "tattoos above his eyebrows."

On May 13, 2005, Sergeant Montalbo was on duty when he heard the report of the shooting on Palm Avenue that involved a burgundy SUV. Back in 2005, Sergeant Montalbo did not know any other gang member in Watsonville that drove a burgundy

6

SUV aside from defendant. Sergeant Montalbo was directed to search for the suspect vehicle, so he drove over to defendant's house. Sergeant Montalbo suspected defendant was involved because of the description of the suspect's car and the fact that defendant was a gang member with a history of firearms. Sergeant Montalbo also knew that there was an ongoing feud between the Northside Watsonville and City Hall gangs at the time of W.M.'s murder. Sergeant Montalbo did not find the burgundy SUV when he went to defendant's house.

### F. The Impounding of the Yukon SUV and Defendant's Flight

In 2005, San Mateo County Sheriff's Department Sergeant Vincent Bedolla was employed as a detective with the Watsonville Police Department and was assigned to investigate the homicide. On May 15, 2005, Sergeant Bedolla learned that another officer was making a traffic stop on a burgundy Yukon SUV, which was possibly a suspect vehicle in the homicide investigation. Sergeant Bedolla went to the other officer's location. The other officer was issuing a citation to the SUV's driver, C.R., who had two children with her. C.R. was defendant's sister. Sergeant Bedolla told C.R. that they suspected that the car had been involved in a shooting. C.R. told Sergeant Bedolla that she was the primary driver of the SUV, and on the day of the murder, she had driven the car to the farmers' market and then to Target at around 8:00 p.m. C.R. also said that defendant had not driven the SUV the preceding Friday or that Saturday. C.R. seemed evasive, but she voluntarily accompanied the officers back to the police station. The SUV was seized as evidence.

Sergeant Bedolla interviewed C.R. at the police station and drove her home afterwards. Sergeant Bedolla saw defendant standing inside the garage when he neared C.R.'s house. Sergeant Bedolla parked his car, and C.R. started to walk toward the house. Sergeant Bedolla heard C.R. say something to defendant. Sergeant Bedolla could not make out what C.R. said, but defendant immediately walked away into the house.

7

Sergeant Bedolla called the other detectives assigned to the case and asked if he should make contact with defendant, and the other detectives told him to "stand down."

Approximately five hours later, Sergeant Bedolla returned to the house with five other officers and attempted to make contact with defendant. The officers searched the house, but they were unable to locate defendant. No other evidence was found at the house.

Later, Sergeant Bedolla conducted a search of the SUV. Inside the car, Sergeant Bedolla found paperwork with defendant's name, defendant's driver's license, and a receipt that was dated the same day as the murder. Sergeant Bedolla also discovered that the left rear tire was a spare tire, and a flat tire was located inside the back of the car.

At some point, D.A. was also taken to the police station to identify a vehicle that officers had seized. The car was a burgundy Yukon with tinted back windows. D.A. thought that the car looked similar to the car that he saw on the day of the murder. D.A., however, told officers that the car involved with the murder had "chrome striping" on it, and the car at the police station did not.

### G. Forensic Analysis

Officers found bullets and bullet fragments at the scene of W.M.'s murder. A forensic analysis of the bullets revealed that the bullets were all .38-caliber and appeared to be fired from the same weapon. A bullet recovered from D.A.'s leg was indistinguishable from the bullets recovered at the scene.

A criminalist analyzed samples taken from the burgundy SUV seized from C.R. and found gunshot residue. The criminalist opined that "the most likely explanation for the distribution of particles" was that a gun was fired by someone sitting in the driver's side of the car, but it was "not necessarily the only explanation." The criminalist also believed that the evidence in the case was consistent with the gun being fired from within the car.

8

The forensic pathologist who conducted W.M.'s autopsy determined that W.M. had a gunshot wound that entered his left upper arm and went through his chest. The gunshot, which was lethal, went through the left lung, the heart, the right lung, and exited the right chest. W.M. had another gunshot wound that went through the left side of his chest. The forensic pathologist did not visually see gunshot residue on W.M.'s clothing or skin. In his report, the pathologist wrote that W.M. had a "distant gunshot wound of entrance," which meant that the gun was "fired at a distance probably greater than two feet from the surface of the victim's body."

### H. The Reopening of the Case

In 2009, W.M.'s murder remained a cold case and was assigned to Watsonville Police Department Sergeant Jarrod Pisturino. In early September 2009, Sergeant Pisturino was told that defendant had been arrested in South Carolina. Sergeant Pisturino asked his partner, Inspector Morgan Chappell, to assist with the investigation.[5]

Sergeant Pisturino arranged to interview D.A., who was difficult to locate. D.A.'s mother said that he was scared of retaliation. When Sergeant Pisturino first spoke with D.A., D.A. was suspicious and paranoid. D.A. was worried that some of W.M.'s friends may have been involved in his murder. In one interview, D.A. said that the SUV's passenger pointed a gun but did not fire it. D.A. described the driver of the SUV as chubby with tattoos over his eyes. D.A. said that after he was shot, he saw the SUV's passenger hang out of the window with a gun in his hand. D.A. also said that the passenger could have been a person named "Gabe," which was one of W.M.'s friends.

---

[5] Inspector Chappell later testified as the prosecution's gang expert. Sergeant Pisturino identified Inspector Chappell as a detective with the Watsonville Police Department, but during his testimony, Inspector Chappell stated that he was now an inspector with the district attorney's office.

At one point, D.A. told officers that he thought that it was the passenger who fired the gunshots.

Sergeant Pisturino and Inspector Chappell traveled to South Carolina and interviewed defendant. Defendant said that after he left Watsonville, he traveled to Wisconsin, then to Mexico, and eventually settled in South Carolina. Defendant said that he did not know who W.M. was.

### I. Testimony of Gonzalez, Moreno, and Rodriguez

#### i. Gonzalez's Testimony

Olegario Gonzalez had been a City Hall gang member since he was 18 years old. When Gonzalez met defendant, he understood that defendant was involved with gangs and was a City Hall gang member. Gonzalez and defendant "hung out in the same crowd" of City Hall gang members, including Dennis Moreno. Gonzalez's nickname in the gang was "Bandit." Moreno's nickname was "Menace." Defendant had tattoos that said "Bandit" on his right wrist and "Menace" on his left wrist.

On May 13, 2005, defendant picked Gonzalez up in a "burgundy Yukon, Suburban." Moreno was in the car with defendant. The men drove to Santa Cruz, drinking beer and tequila and smoking marijuana on the way. When they arrived in Santa Cruz, they bought even more beer and went to a fellow City Hall gang member's house. Gonzalez, who was drunk, stole a neighbor's car stereo.

Afterwards, the men left and headed toward Watsonville. Defendant drove the car, Moreno sat in the front passenger seat, and Gonzalez sat in the middle back seat. Gonzalez was still drunk. He remembered that there was another person in the car, but he could not remember who that person was. Gonzalez vaguely remembered that they dropped someone off when they arrived in Watsonville. At some point, Gonzalez got out of the car and threw up.

10

Defendant continued to drive, and Gonzalez remembered that defendant stopped the car on a street with palm trees. Gonzalez saw two people walking on the street, including a person who was on a bike. Gonzalez remembered that he saw "a white and a black dude," and the Caucasian man was limping. Gonzalez remembered that after defendant stopped the car, the Caucasian man said, " 'What's up, Manuel?' " At that time, the driver's side was the closest side to the Caucasian man. Defendant responded, " 'You guys trippin' or what?' " Defendant pulled out a silver semi-automatic handgun and shot at the two men out of the driver's side window. Defendant fired the gun "three or four times, five times" and hit both the "white kid" and the "black kid." Gonzalez did not know that defendant had a gun with him, and he was shocked at what had happened and did not say anything to defendant. Moreno also did not say anything to defendant.[6]

Defendant quickly drove away after the shooting. As defendant drove, Moreno said, " 'He hangs out with Northsiders.' " Defendant hit a bump, but he kept driving until he reached a house in Las Lomas. Gonzalez did not know the name of the man who lived in Las Lomas, but he knew that the man was a "Paisano," someone who came from Mexico who was not a gang member. The Paisano wiped down defendant's car with bleach wipes. Gonzalez noticed that one of the car's tires had separated from the rims, but he did not remember anyone changing the tire out that day.

Defendant told the Paisano to call Emanuel Rodriguez to find out what had happened because Rodriguez listened to the police scanner. The Paisano called Rodriguez and told defendant that one person had been killed and another person had been shot in the testicles. Defendant asked Gonzalez and Moreno to clean the car. Gonzalez found "maybe three" shell casings and Moreno found "other ones."

---

[6] Gonzalez testified that he never saw Moreno with a gun, and he would have remembered if Moreno leaned out of the car with a gun and said something to W.M.

11

Gonzalez found the casings in the back of the car across from the center console. Gonzalez used bleach wipes to wipe his fingerprints from the backseat of the car. Gonzalez and Moreno put the shell casings in a bag.

Afterwards, defendant, Gonzalez, and Moreno went back inside defendant's SUV. Defendant drove the car and followed the Paisano, who drove a truck, to a house across the street near a field. The men cleaned the car a second time and looked for more bullet casings. They wiped the windows with bleach wipes. Afterwards, the Paisano drove the men in his truck to Rodriguez's house. When they arrived, the men told Rodriguez about the shooting, which he already knew about. Gonzalez smoked some marijuana and did a line of "crystal meth." Afterwards, the Paisano dropped Gonzalez off at his house. Gonzalez never saw Moreno or defendant again.

Gonzalez kept the gun used during the shooting, which belonged to Rodriguez. Gonzalez hid the gun in his bathroom for about two weeks. Rodriguez later told him to cut the gun in half. Gonzalez tried to cut the gun in half, but he only managed to scratch it. Gonzalez gave the gun back to Rodriguez, and someone later threw the gun out of a car while the men drove to Moss Landing.

Gonzalez testified that at the time of W.M.'s murder, City Hall was involved in a gang war with another Norteño gang, Northside Watsonville. Gonzalez was upset when his friend and fellow City Hall gang member Isaac Guzman was killed, and he believed that Guzman had been killed by "Northsiders." Gonzalez recalled that City Hall had a meeting following Guzman's murder. At the meeting, City Hall gang members " 'got [the] green light on Northsiders,' " meaning that they could "try to take [Northsiders] out" if they saw them.

At some point, Gonzalez learned that a Northside gang member who went by the nickname "Sneaky" got shot.[7] After the shooting, Rodriguez came over to Gonzalez's house. Rodriguez asked Gonzalez if he could leave his truck at Gonzalez's house because the truck was "hot." Gonzalez told Rodriguez no. Gonzalez pieced together that the shooting that he had learned about had something to do with why Rodriguez wanted to leave his truck at Gonzalez's house.

In 2006, Gonzalez was convicted of receiving stolen property and robbery with the use of a weapon. At the time, he was still a member of City Hall. Gonzalez was paroled in December 2008, but he violated his parole by associating with gang members and went back to prison. He was released from prison in 2009.

At some point in 2009, defendant called Gonzalez and told him that he wanted to go back to California and that he missed his family. Defendant said that he had traveled to "Mexico, Nebraska, like a couple [*sic*] places." Defendant also said that he had been back in Watsonville several times.

Gonzalez did not speak to defendant again until defendant was in jail sometime in 2009 or 2010. At that time, defendant told Gonzalez, " 'A black dude is gonna come and testify. Can you find him and take care of him?' " Gonzalez understood defendant to mean that he did not want the witness to come to court. Gonzalez responded, " 'Let me see what I can do.' " Gonzalez, however, did not intend to do anything.

In 2012 or 2013, Gonzalez overheard a conversation where Moreno spoke about a murder in Redwood City. Moreno said that someone named Pablo Hernandez had

---

[7] Inspector Chappell later testified that "Sneaky" was the gang moniker for a Northside member named Brian Smith.

testified at a trial, and Hernandez did not say anything about a murder that took place in Redwood City.[8]

In 2014, Gonzalez was arrested for an attempted murder following a drive-by shooting. Gonzalez later provided surveillance videos that showed that he was not in the car that was involved in the drive-by shooting. He subsequently reached an agreement with the district attorney that he would provide information about certain cases, including W.M.'s murder. Gonzalez received a sentence of four years as part of his agreement. He and his family were relocated and were receiving money for rent and food. Gonzalez was also granted immunity in exchange for his testimony.

Gonzalez said that he agreed to cooperate with the district attorney's office because he had changed after he went to jail. Gonzalez said that City Hall had gone "after [his] family." At one point, Gonzalez attempted to become active again with the gang so he could protect his family, but he eventually dropped out of the gang.

ii.     ***Moreno's Testimony***

Moreno grew up in Watsonville and started associating with City Hall gang members when he was around 17 years old. Moreno became a City Hall gang member when he was 19 years old. Moreno was good friends with Isaac Guzman. When Guzman was murdered, City Hall gang members believed that a "Northsider" was responsible for his death. As a result, there was a "war" between the City Hall and Northside gangs. Moreno was also good friends with defendant and Gonzalez.

On May 13, 2005, defendant, Moreno, and Gonzalez went to Guzman's grave site together. After visiting the cemetery, they drove around in defendant's SUV.

---

[8] Based on Gonzalez's statements, Inspector Chappell tried to see if he could find a murder similar to the one Moreno described, but he was unsuccessful.

14

Moreno sat in the front passenger seat, and Guzman sat in the back seat behind the passenger. There was nobody else in the car.

At some point, defendant started to drive down Palm Avenue. Moreno saw W.M. with "some black guy." Moreno had seen W.M. before, and he thought that W.M. was a Watson Varrio Norte gang member. Watson Varrio Norte was a "farm team" for the Northside gang. W.M. was on a bicycle, and he was "hanging out" on the street.

W.M. and his friend were on the other side of the street, and defendant made a U-turn and stopped near W.M. W.M. came up to the SUV's passenger window right next to Moreno. Defendant said, " 'What's up, fucker?' " Before W.M. could respond, defendant shot him with a silver gun. Defendant held the gun in front of Moreno's face near his left eye. Moreno felt gunpowder in his face and heard ringing in his ears. W.M. fell down, and defendant shot W.M.'s friend. Moreno and Gonzalez did not have guns that day.

Gonzalez said, " 'You fucked up, Manuel.' " Defendant responded, " 'Fuck him, he hangs around with Northside.' " Defendant then accelerated away. Defendant drove to a house in Las Lomas, and the three men cleaned the car. Defendant talked to someone inside the house and brought out cleaning spray and a rag to clean the car for gunpowder residue. Defendant swallowed one of the bullets, and he used a water hose to scrub his face and body.

After W.M.'s murder, Moreno started to distance himself from the City Hall gang. Moreno did not know what happened to defendant's gun, and he did not see defendant again. Moreno remembered that defendant had tattoos above his eyebrows at the time that W.M. was murdered.

In 2007, Moreno went to prison for receiving stolen property. He also had a prior conviction for assault. Moreno was in prison for about a year, and it changed the way

15

that he looked at being in a gang. Some of the "lifers" in prison told Moreno that he should be out providing for his family instead of being in prison.

Later, Moreno had a meeting with the district attorney's office about his knowledge of W.M.'s murder.[9] Moreno was subsequently granted immunity for his testimony at trial. Moreno and his family were relocated for their safety, and they were being given money for food and rent.

### iii. *Rodriguez's Testimony*

In 2005, Rodriguez was a member of the City Hall gang.[10] Rodriguez was 18 years old when he joined City Hall, and he was given the nickname "Little Stomper." Rodriguez was not currently an active member of his gang, but he would be considered a "rat" after he testified at trial and would no longer be able to go back to Watsonville. Rodriguez thought of defendant as his brother and had known him for 15 years.

Back in 2004, defendant was a member of the City Hall gang and went by the nickname "Little Vago." Isaac Guzman, a City Hall gang member, was killed in December 2004, and Rodriguez believed that Northside was behind Guzman's murder.

On May 13, 2005, Rodriguez heard over the police scanner that a shooting involving a burgundy SUV had occurred on Palm Avenue. When Rodriguez heard the description of the car over the scanner, he hoped that the shooting did not involve

---

[9] Moreno was interviewed by police officers shortly after W.M.'s murder on May 17, 2005. At that time, Moreno told officers that on the day that W.M. was killed, he had gone with his sister and his sister's boyfriend or husband to a mall in San Jose at around 5:00 p.m. and had returned to Watsonville at 10:00 p.m., which is when he learned about the murder. Moreno said that he did not find out the identity of who had been killed until his brother purchased a newspaper the following Monday.

[10] Rodriguez testified that he did not want to come to court to testify against defendant, and he only did so because he was ordered to by the court.

defendant. Rodriguez, however, could not remember anybody coming over to his house after he heard about the shooting on the scanner.

At the time of W.M.'s murder, Rodriguez owned four guns, and one of them may have been a silver .380 semi-automatic gun. The .380 semi-automatic gun was available to be used by any City Hall gang member. Rodriguez could not remember if he ever gave the gun to defendant. At some point, Rodriguez heard that Gonzalez was trying to sell a gun that was involved in a shooting, and he eventually got a gun back from Gonzalez, but he was not sure which gun it was.[11] Later, Rodriguez went on a fishing trip and tossed the gun that he got from Gonzalez into the ocean.[12]

Rodriguez previously told investigators that defendant had once told him that he had shot two people, but he testified at trial that he could not recall making that statement. Rodriguez, however, recalled that he had previously told investigators, "Manuel told me that they didn't mean for anybody to get killed."

Rodriguez had a prior conviction for drunk driving. He testified for the prosecution under a grant of immunity.

### J. Jose Contreras's Testimony

In May 2005, Jose Contreras was friends with Rodriguez and was living in Las Lomas.[13] One evening, defendant drove over to his house in an SUV. Defendant was by himself, and he was acting a little nervous. Defendant asked Contreras if he had a water hose. Contreras answered yes and told defendant to park at the back of the house. Contreras used the water hose and helped defendant wash himself.

---

[11] At trial, Rodriguez testified that he received the gun from Bandit, which is Gonzalez's gang moniker.

[12] At one point, Rodriguez told investigators that his brother said that he knew where the gun was.

[13] The prosecution's gang expert later testified that Contreras was a drug dealer.

17

Afterwards, defendant looked through his car as if he was trying to find something. Defendant was at Contreras's house for approximately 15 minutes. Contreras did not remember giving defendant a ride back to Rodriguez's house, and he did not recall giving defendant any sort of cleaning supplies. Defendant mentioned someone that went by the name "D," who lived in an area with lots of fields.

### K. Gang Evidence

#### i. The Norteño and the City Hall Gangs

District Attorney's Office Inspector Chappell had previously worked for the Watsonville Police Department as a gang detective and as a correctional officer at San Quentin State Prison. Inspector Chappell testified for the prosecution as a gang expert.

According to Inspector Chappell, there used to be one prison gang called the Mexican Mafia that protected Hispanic inmates. However, another group did not like the way the Mexican Mafia treated some Hispanic inmates, so the Nuestra Familia prison gang was created. The Nuestra Familia has a document called "The Constitution," which describes the rules that gang members must follow. The Nuestra Raza prison gang is one tier below the Nuestra Familia. The Nuestra Familia is the "supreme" Norteño gang and sets rules and policies for all Norteños. If a gang member does not follow the rules and is deemed a coward or traitor, the member will be "greenlit" and marked to be assaulted or possibly killed. Gang members are not supposed to testify in court or cooperate with the police.

The Mexican Mafia also has rules and regulations that its members are supposed to follow. For example, Sureños are not permitted to commit drive-by shootings; they have to get out of the car before they shoot someone.

Norteños associate with the color red and the number 14. The gang also uses a "huelga" bird as a symbol. There are many Norteño subsets in Watsonville, including

18

City Hall and Northside Watsonville. The primary activities for a gang like City Hall include "robberies, shootings, stabbings, [and] group assaults."

###### ii. *Predicate Offenses*

Inspector Chappell testified about prior convictions of other City Hall gang members. The certified conviction record for Richard Betancourt ("Devil"), was introduced into evidence. Betancourt was convicted of robbery and attempted robbery with a gang enhancement in November 2003. Moreno and Gonzalez's certified conviction records were also admitted into evidence. Moreno was convicted of burglary in February 2004. Gonzalez was convicted of grand theft in November 2003. Inspector Chappell also testified that on February 23, 2005, Officer Montalbo came across several City Hall gang members inside the Yukon driven by defendant and found a loaded gun inside the car. Sergeant Montalbo had previously testified about the same incident. Inspector Chappell further testified about the shooting of Brian Smith ("Sneaky"), a Northside member, who was shot using the same gun used to kill W.M. as part of a gang war between the two Norteño gangs. Investigators suspected that City Hall was behind Smith's shooting.

###### iii. *Additional Evidence About the Gang War*

Watsonville Police Department Sergeant Eric Montalbo was a patrol officer in 2005. Sergeant Montalbo had extensive experience dealing with gangs in Watsonville, and he knew that there were Norteño and Sureño gangs within the city. Generally, Norteños and Sureños were enemies, and there was an understanding that Norteños should not fight or inflict violence on other Norteño gangs. The gangs, however, did not always abide by those rules. In 2004 and 2005, there was a "war" between two Norteño gangs in Watsonville, City Hall Watson and Northside Watsonville.

According to Sergeant Montalbo, around 2004 and 2005, Isaac Guzman, a City Hall gang member, was stabbed multiple times and killed. Sergeant Montalbo responded

19

to the scene of Guzman's murder. Eventually, investigators developed a suspect for Guzman's murder, Mario Lozano, a Northside Watsonville gang member.

Inspector Chappell also testified about the gang war. According to Inspector Chappell, the gang war started after Lozano, a member of Northside Watsonville, was allegedly shot by Guzman. Lozano then murdered Guzman by stabbing him to death with a knife in December 2004. Guzman's murder took place in broad daylight, and someone even took pictures of what happened. Investigators believed that City Hall gang members were responsible for shooting Smith. Inspector Chappell testified that Gonzalez's testimony that Rodriguez came to his house to try to hide a truck shortly after Smith's shooting was consistent with City Hall being involved with the shooting. There was also evidence that the City Hall gun used to kill W.M. was involved with Smith's shooting.

### iv. *W.M.'s Gang Association*

Sergeant Bedolla had known W.M. since he was a small child. As W.M. got older, he started associating with people who Sergeant Bedolla knew to be Norteños. Inspector Chappell testified that he believed that W.M. was an associate of "Watsonville Norte" based on his review of police reports concerning W.M.

### v. *Defendant's Gang Association*

Inspector Chappell opined that defendant was an active City Hall member at the time that W.M. was murdered. Chappell's opinion was based on defendant's conduct, the tattoos that he had, the admissions he had made to law enforcement, and the fact that he was in contact with other City Hall members. Defendant had a tattoo over his eyebrows that said, "Watson Locos," and a tattoo on his neck that said, "City Hall Soldier." Defendant also had a filled-in teardrop tattoo in the corner of his left eye, which could mean that he committed a murder or a hit for the gang. Before W.M.'s murder, defendant did not have a filled-in teardrop tattoo. Defendant also had tattoos that

20

said "Bandit," "Menace," and "Little Stomper." Inspector Chappell believed that defendant knew that the City Hall members engaged in criminal activity based on the fact that defendant had been arrested with and had committed crimes with other Norteños and City Hall gang members. Inspector Chappell also testified that committing murder of a perceived rival would garner respect within the gang.

### L. Defendant's Sister's Testimony

In 2005, C.R., defendant's sister, was 17 years old. She lived in Watsonville with her infant son, her siblings (including defendant), her mother, her stepfather, and the family's nanny. C.R. believed that defendant was a City Hall gang member. C.R. was close with her brother, but defendant kept C.R. away from "anything that had to do with gangs."

The family had several cars, including a burgundy or red Yukon SUV. C.R.'s mother often used the SUV to run errands or purchase produce. The family sold items at a farmers' market that was held every Friday.

On May 13, 2005, C.R. arrived home after work at around 3:00 p.m. Defendant was the only adult at home, and he was watching his minor siblings. C.R. drove to the farmers' market using a white Nissan, and she saw that the SUV was parked in the garage when she left. Sometime around 3:00 or 5:00 p.m., C.R.'s mother called defendant and asked him to bring ice to the farmers' market. Defendant drove over in the SUV, dropped off the ice, and left.

C.R. arrived home at around 8:00 p.m. that evening. Defendant was already home, and the burgundy SUV was in the garage. Defendant took a shower and got ready to go out to meet a woman, N.P. N.P. was married to someone else at the time. C.R. drove defendant to the cemetery using the burgundy SUV and dropped him off at around 8:20 or 8:30 p.m. The only person C.R. saw at the cemetery was N.P. When C.R. arrived back home, she parked the SUV in the garage. C.R.'s bedroom was located over

21

the garage, and she would have heard the garage door open if someone had taken the SUV out. The next morning, C.R. got up at around 9:00 a.m. and saw that the SUV was still in the garage.

On May 14, 2005, C.R. drove the SUV to a shopping center to get her hair ready for prom. After she came home, she parked the SUV. The SUV was parked in the same spot when her prom date came to get her, and it was still in the same spot when she came home that evening.

On May 15, 2005, C.R. was stopped by the police while driving the SUV. She had her one-year-old son and her two three-year-old twin brothers with her at the time. C.R. went with the officers to the police station, where she stayed for several hours. She never saw the SUV again. After the car was taken, C.R. was transported home. As she walked toward her house, she saw defendant in the garage. Defendant came out to help C.R. with the children, and he asked where she had been and what had happened to the car. C.R. told defendant that the police had taken the car. Defendant left later that week to see their father in Mexico, who was battling cancer.

On May 20, 2005, C.R. spoke to the police and told them that she had driven the SUV to Target at the time of W.M.'s murder. C.R. later admitted that she had lied to the police. After officers told her that they thought she was lying about going to Target and that they were going to pull surveillance tapes from the Target store to confirm her story, C.R. told officers that she had driven her brother to the cemetery that night. C.R. said she did not tell officers about defendant's meeting with N.P. because N.P. was married at the time.

C.R. previously told the police that her friend, J.H., had called her the evening of the murder and had told her that she had seen defendant driving the burgundy SUV. C.R., however, had initially told the police that J.H. had called her and accused her of being involved with J.H.'s boyfriend.

22

### M.  J.H.'s Testimony

J.H. lived in Watsonville in 2005 and was friends with C.R.  In May 2005, she saw a reckless car driving in front of her house.  She called C.R. after the car drove by and told C.R. that she thought she had seen C.R.'s mother's car.  C.R. told J.H. that her mother's car was at home and defendant was at the cemetery.  J.H. knew W.M.; W.M. used to be best friends with the father of J.H.'s children.  In 2012, J.H. identified defendant as the driver of the SUV that she saw that evening.  At trial, however, J.H. could not remember saying that she thought the driver of the SUV looked like defendant.

### N.  N.P.'s Testimony

In 2005, N.P. was married and lived in Watsonville.  N.P. was Isaac Guzman's aunt.  She met defendant at Guzman's funeral and became romantically involved with him sometime in 2005.  When they had their affair, N.P. and defendant would meet up two or three times a week during the evenings.  N.P. did not remember if she and defendant ever planned out their dates, and she remembered that they usually just ran into each other at the cemetery.  N.P. knew defendant's sister C.R., and she remembered that C.R. sometimes dropped defendant off at the cemetery.  N.P. and defendant's dates would usually end around 9:00 p.m. because N.P. had to go back to her husband.  N.P. owned a burgundy Yukon.

### O.  Defense Testimony on Gang Tattoos

Glenn Rouse, a private investigator, had previously been employed as a police officer with the Salinas Police Department and had been a gang intelligence officer for three years.  Rouse had also received training about gangs, and he had previously testified as a gang expert in other cases.  Rouse testified for the defense.  In part, he testified that the teardrop tattoo had "lost its significance" and "in and of itself, [was] not a gang tattoo."  Rouse opined that there was no significance behind whether a teardrop tattoo is

filled in or not filled in. Thus, a filled-in teardrop tattoo does not necessarily mean that a gang member has killed someone.

### P. Stipulations

The parties stipulated that on May 16, 2005, officers showed D.A. a series of photographic lineups that included pictures of defendant and Moreno. D.A. did not identify anyone in the lineups. The parties also stipulated that an analysis of the bullets fired at W.M. and D.A. confirmed that they were fired using the same gun involved in the shooting of Brian Smith, and Smith's shooting took place on December 4, 2004.

### 3. The Verdict and Sentencing

The count of active participation in a criminal street gang (§ 186.22, subd. (a); count 3) was not submitted to the jury and was later dismissed on the prosecutor's motion.

On March 13, 2018, the jury found defendant guilty of second degree murder (§ 187, subd. (a); count 1) and attempted murder (§§ 664, 187, subd. (a); count 2). As to both counts, the jury found true the allegation that defendant and a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (d) & (e)), and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

On October 25, 2018, the trial court sentenced defendant to a determinate term of 19 years and a consecutive term of 65 years to life. The sentence was composed of a term of nine years for the attempted murder, 10 years for the gang enhancement for the count of attempted murder, 25 years to life for the firearm enhancement for the count of

24

attempted murder, 15 years to life for second degree murder, and 25 years to life for the firearms enhancement for the count of murder.[14]

## DISCUSSION

1. ***Constitutionality of Section 186.22, subdivision (b)***

Defendant argues that section 186.22, subdivision (b) is unconstitutionally vague and overbroad because it fails to define the term "members" as used in the statute. As we explain, we find no merit in defendant's arguments.

### A. *General Legal Principles and Standard of Review*

Section 186.22, subdivision (b)(1) provides for a sentencing enhancement for persons who are "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang *members . . . .*" (Italics added.)

In turn, section 186.22, subdivision (f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose *members* individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Italics added.)

" 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of

---

[14] The trial court stated that it did not impose a sentence on the gang enhancement for the count of second degree murder "because of the limitation of Penal Code section 1170.1."

25

law in this context requires two elements: a criminal statute must " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' " ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 605 (*Morgan*).) "A statute is only overbroad if it 'prohibits a " 'substantial amount of constitutionally protected conduct.' " ' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333.)

"A defendant's constitutional challenge to a penal statute may be based on the contention that the law is unconstitutional as applied to him, or he may seek to have it found facially invalid." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1348.) "As a general rule, a statute is 'facially unconstitutional' if it conflicts so directly with a constitutional provision that the statute is completely invalid and unenforceable in all circumstances." (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166.) "We review questions regarding the constitutionality of a statute de novo." (*People v. Solis* (2020) 46 Cal.App.5th 762, 771.)

### B. Analysis

Defendant does not specifically argue that section 186.22, subdivision (b) is unconstitutional as applied to him; he argues generally that the statute's failure to adequately define "members" renders it constitutionally infirm. Thus, we interpret his arguments as a facial attack on section 186.22. With this framework in mind, we proceed to analyze his claims.

First, we reject defendant's contention that the statute is unconstitutionally overbroad. Even if we assume that a overbreadth claim is available outside the First Amendment context (but see *Schall v. Martin* (1984) 467 U.S. 253, 268, fn. 18 ["outside the limited First Amendment context, a criminal statute may not be attacked as overbroad"], defendant has not shown that section 186.22 " 'prohibits a " 'substantial amount of constitutionally protected conduct.' " ' " (*People v. Rubalcava*, *supra*, 23

26

Cal.4th at p. 333.)  Aside from providing a general definition of what constitutes overbreadth, defendant does not provide argument or analysis on *how* section 186.22 is constitutionally overbroad, or what constitutionally-protected conduct the statute prohibits.  " '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Second, we find no merit in defendant's contention that section 186.22 is unconstitutionally vague because it fails to define the term "members."  Although the term is not defined within the statute, it is commonly used and no further definition or clarification is required.  " 'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like.  Indeed, a wide spectrum of human activities is regulated by such terms:  thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances [citation], while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault [citation] . . . .  "There is no formula for the determination of reasonableness."  Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' " (*Morgan*, *supra*, 42 Cal.4th at p. 606.)

In *People v. Green* (1991) 227 Cal.App.3d 692 (*Green*), overruled on a different point as stated in *People v. Castenada* (2000) 23 Cal.4th 743, 752 (*Castenada*), the First Appellate District held that section 186.22, subdivision (a), the substantive offense of participation in a criminal street gang, was not unconstitutionally vague.  (*Green*, *supra*, at p. 699.)  The Court of Appeal rejected the argument that the terms " 'actively

participates' " and " 'members' " were uncertain. (*Ibid*.) *Green* determined that " '[m]ember' and 'membership' are terms of ordinary meaning, and require no further definition. [Citations.] Further, 'member' has been judicially defined as meaning that a person bears a relationship to an organization that is not accidental, artificial or unconsciously in appearance only." (*Ibid*.)

Green acknowledged that "criminal liability may not be predicated on nothing more than membership." (*Green*, *supra*, 227 Cal.App.3d at p. 699.) Section 186.22, however, does not make membership in a criminal gang criminal, it makes, under certain circumstances "active participation" in a criminal street gang criminal. (*Green*, *supra*, at p. 700.) *Green* concluded that "[t]he phrase, in context, has the same meaning as 'active membership' as defined by the case law. To be convicted of being an active participant in a street gang, a defendant must have a relationship with a criminal street gang which is (1) more than nominal, passive, inactive or purely technical, and (2) the person must devote all, or a substantial part of his time and efforts to the criminal street gang." (*Ibid*.) In fact, in *Castenada*, the California Supreme Court disapproved *Green* and found that it construed section 186.22 too *narrowly*—and that a person who actively participates in a criminal street gang need not devote " 'all, or a substantial part of his time and efforts' " to the gang; rather, a person actively participates in a criminal street gang if his or her " 'involvement with a criminal street gang . . . is more than nominal or passive.' " (*Castenada*, *supra*, 23 Cal.4th at p. 752.)

Green also distinguished *Lanzetta v. New Jersey* (1939) 306 U.S. 451, a case that defendant relies upon. (*Green*, *supra*, 227 Cal.App.3d at pp. 701-702.) In *Lanzetta*, the Supreme Court concluded that the phrase " 'known to be a member' " of a gang was ambiguous because it immediately "arises the doubt whether actual or putative association is meant." (*Lanzetta*, *supra*, at p. 458.) "If actual membership is required, that status must be established as a fact, and the word 'known' would be without

28

significance. If reputed membership is enough, there is uncertainty whether that reputation must be general or extend only to some persons. And the statute fails to indicate what constitutes membership or how one may join a 'gang.' " (*Ibid*.) Analyzing *Lanzetta*, *Green* concluded that "section 186.22 does not employ the term 'known'; the statute unambiguously refers to actual membership. Moreover, the complaint of the court in *Lanzetta*, that the statute fails to indicate what constitutes membership, was resolved by the cases such as [*Scales v. United States* (1961) 367 U.S. 203] which were decided after *Lanzetta*, and which also involved statutes failing to specify those acts by which a person might be deemed a member." (*Green*, *supra*, at p. 701.) Relying on *Scales v. United States*, *supra*, 367 U.S. 203, 223, *Green* concluded that "it has been held that a 'member' may not be subjected to criminal liability for the acts of the association to which he is a member unless his membership is 'active,' a term which has been held to be well understood in common parlance." (*Green*, *supra*, at pp. 699-700.)

We find *Green* persuasive and conclude that the use of the term "member," which has an ordinary meaning, requires no further definition; thus, the use of the term "member" in section 186.22 does not render the statute unconstitutionally vague. (*Green*, *supra*, 227 Cal.App.3d at pp. 699-701.)

2. ***Predicate Offenses***

Defendant argues that the certified conviction records used to prove predicate offenses under section 186.22 were inadmissible hearsay and deprived him of his right to confront witnesses. He also argues that because section 186.22 was amended to include carrying a loaded firearm as a predicate offense *after* the charged offenses were committed, his prior offense of carrying a loaded firearm cannot serve as a predicate offense without violating the prohibition against ex post facto laws. We conclude that any error in the admission and use of predicate offenses was harmless.

29

### A. Background

On January 24, 2018, the prosecutor filed a motion in limine seeking to admit prior conduct to establish a pattern of criminal gang activity under section 186.22, subdivision (e). The motion in limine did not specify which predicate offenses the prosecution intended to introduce. Defense counsel filed a motion in limine objecting to the certified conviction records on the grounds that their use would violate the confrontation clause. On January 31, 2018, the trial court denied defense counsel's motion in limine and permitted the prosecution to use certified conviction records to prove predicate offenses under section 186.22.

Moreno and Gonzalez testified at defendant's trial, and the prosecutor questioned both of them about some of their prior theft offenses. Gonzalez testified that he could not remember having a theft conviction in 2003. The prosecutor and defense counsel did not ask Moreno if he had a theft conviction in 2004. After Gonzalez and Moreno finished testifying, the trial court excused both witnesses subject to recall during the defense case.

Inspector Chappell subsequently testified as a gang expert. During his testimony, Inspector Chappell was asked about prior convictions of City Hall gang members. The certified conviction record for Richard Betancourt ("Devil"), was introduced into evidence. Betancourt was convicted of robbery and attempted robbery with a gang enhancement in November 2003. Moreno's and Gonzalez's certified conviction records were also admitted into evidence. Moreno was convicted of burglary in February 2004. Gonzalez was convicted of grand theft in November 2003. None of the certified convictions contain information about when the underlying offenses were committed; the certified conviction records only disclose the dates of the criminal convictions. During trial, when the certified conviction records were admitted into evidence, defense counsel objected by saying that his "[p]rior objections [were] reserved." The trial court overruled defense counsel's objections to the certified conviction records.

30

Inspector Chappell also testified that on February 23, 2005, Sergeant Montalbo came across several City Hall gang members inside the Yukon driven by defendant and found a loaded gun inside the car. Sergeant Montalbo had previously testified about the same incident earlier in defendant's trial.

Inspector Chappell further testified that investigators believed that City Hall was responsible for shooting Smith, a Northside member. Inspector Chappell opined that Gonzalez's testimony that Rodriguez came to his house to try to hide a truck shortly after Smith's shooting was consistent with City Hall being involved with the shooting. The parties later stipulated that Smith's shooting took place on December 4, 2004, and the bullets used in Smith's shooting matched the bullets fired at W.M. and D.A.

After the close of evidence, the jury was instructed with the definition of a criminal street gang as follows: "A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] 1. That has a common name or common identifying sign or symbol; [¶] 2. That has, as one or more of its primary activities, the commission of Penal Code section 487, Grand Theft from a Person, Penal Code section 459, Burglary; Penal Code section 211, Robbery; Penal Code section 245, Assault with a Deadly Weapon; Penal Code section 12031, Carrying a Loaded Firearm in a Vehicle. [¶] AND [¶] 3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity."

The jury was also instructed with the following definition of a pattern of criminal gang activity: "1. The commission of, attempted commission of, conspiracy to commit, or conviction of any combination of two or more of the following crimes: Penal Code section 487, Grand Theft from a Person; Penal Code section 459, Burglary; Penal Code section 211, Robbery; Penal Code section 245, Assault with a Deadly Weapon; Penal Code section 12031, Carrying a Loaded Firearm in a Vehicle; [¶] 2. At least one of those crimes was committed after September 26, 1988; [¶] 3. The most recent crime occurred

31

within three years of one of the earlier crimes; [¶] AND [¶] 4. The crimes were committed on separate occasions, or were personally committed by two or more persons."

Finally, the jury was instructed as follows: "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime, and whether a pattern of criminal gang activity has been proved."

### B. Prejudice

As we have described, multiple predicate offenses were introduced to establish the pattern of gang activity required under section 186.22.[15] Thus, we conclude that even if we do not consider the certified conviction records and the charge for carrying a loaded firearm, any error with respect to the predicate offenses was harmless under any standard.

Defendant disagrees and argues that any error cannot be harmless, relying on *People v. Chun* (2009) 45 Cal.4th 1172. In *Chun*, the California Supreme Court held that assaultive-type crimes merge with the charged homicide and cannot form the basis for a second degree felony-murder instruction. (*Id*. at p. 1178.) The instructions given to the jury in *Chun* permitted the jury to find the defendant guilty of second degree murder either based on malice or the felony-murder rule. (*Id*. at pp. 1202-1203.) *Chun* observed

---

[15] We note that the certified conviction records of Betancourt, Moreno, and Gonzalez did not contain information about when the offenses were committed. Moreover, there was no additional testimony at trial that established the date of the offenses. Thus, the jury could not have relied solely on certified conviction records to determine a pattern of criminal gang activity because there is no way to ascertain from the records whether the predicate offenses fit the timing requirements under section 186.22, subdivision (e). Under section 186.22, subdivision (e), a pattern of criminal gang activity means the commission of two or more enumerated offenses provided that "at least one of [the] offenses occurred after the effective date of this chapter and the last of [the] offenses occurred within three years after a prior offense."

32

that "[i]nstructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*Id*. at p. 1201.) Thus, in the situation before the *Chun* court, "a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory, i.e., either express or conscious-disregard-for-life malice." (*Id*. at p. 1203.) Relying on *Chun*, defendant argues that in this case, no court can conclude that there is no reasonable doubt that the jury relied on a legally adequate theory when it found the gang enhancement true.

We disagree and find *People v. Fiu* (2008) 165 Cal.App.4th 360 (*Fiu*) and *People v. Bragg* (2008) 161 Cal.App.4th 1385 (*Bragg*) to be instructive. In *Fiu*, the trial court took judicial notice of and the jury was instructed on three predicate offenses, one of which was not an offense that was listed in section 186.22, subdivision (e). (*Fiu*, *supra*, at pp. 387-388.) *Fiu* concluded that the instructions were erroneous, but the error was harmless because the gang enhancement allegation "requires proof of only two enumerated offenses in order to prove a pattern of criminal gang activity" and "the remaining two offenses that the trial court took judicial notice of, and instructed the jury regarding, provided the two necessary predicate offenses." (*Id*. at p. 388.)

Likewise, in *Bragg*, the jury was erroneously instructed that a pattern of criminal gang activity could be based on the commission of a predicate offense that was not statutorily enumerated under section 186.22. (*Bragg*, *supra*, 161 Cal.App.4th at p. 1400.) At the defendant's trial, a gang expert testified about an additional valid predicate offense committed by a validated gang member. (*Id*. at pp. 1392-1393.) *Bragg* concluded that the predicate offense described by the gang expert "was uncontested and there is no question the jury found the commission of that offense true beyond a reasonable doubt." (*Id*. at p. 1401.) Moreover, the "jury necessarily found a second predicate offense, the commission [of the charged offenses], true beyond a reasonable doubt by virtue of the

33

jury's conviction of defendant for those underlying crimes." (*Ibid*.)  The charged offenses could be used to determine a pattern of criminal street gang activity.  (*Ibid*.) Thus, *Bragg* concluded that any error in instructing the jury on an invalid predicate offense was harmless beyond a reasonable doubt.  (*Ibid*.)

In this case, the charged offenses, murder and attempted murder, are enumerated predicate offenses under section 186.22, subdivision (e), and the jury found defendant guilty of both crimes beyond a reasonable doubt.[16]  (See *People v. Loeun* (1997) 17 Cal.4th 1, 10; *Bragg, supra*, 161 Cal.App.4th at p. 1401.)  We determine that the charged crimes constitute only one predicate offense, not two.  Section 186.22, subdivision (e) defines a pattern of criminal gang activity as "the commission of, attempted commission of, . . . or solicitation of . . . two or more" statutorily enumerated offenses "*committed on separate occasions, or by two or more persons*."  (*Ibid*., italics added.)  The murder and attempted murder were not committed on separate occasions, and there was minimal evidence that the offenses were committed by "two or more persons."  (§ 186.22, subd. (e); see *People v. Zermeno* (1999) 21 Cal.4th 927, 931-932 [when one gang member is the actual perpetrator and another is liable as an aider and abettor, the combined activity of the two constitutes one predicate offense].)

---

[16] We acknowledge that the prosecutor did not expressly argue that a predicate crime could be established by a conviction of the crimes alleged in the current case.  The jury instruction that defined a pattern of criminal street gang activity did not list murder or attempted murder as one of the predicate offenses.  Nonetheless, the jury was expressly instructed that "[i]f you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime, and whether a pattern of criminal gang activity has been proved."  Thus, "[h]owever the prosecutor chose to argue the matter, the jury knew that it could consider the current offenses as a predicate offense under the statute."  (*Bragg, supra*, 161 Cal.App.4th at p. 1402.)

34

In addition, there was undisputed evidence of a second predicate offense, and two predicate offenses are sufficient to find a pattern of criminal gang activity under section 186.22, subdivision (e). Inspector Chappell described that investigators believed that the City Hall gang was behind Smith's shooting, which could qualify as an assault with a deadly weapon. The parties stipulated that the bullets from Smith's shooting matched the bullets fired in W.M.'s murder. The parties also stipulated that Smith's shooting took place on December 4, 2004, which is within three years of the of the date of W.M.'s murder as required under section 186.22, subdivision (e).

For these reasons, we conclude that any error in admitting the certified conviction records and any error in permitting the jury to consider that carrying a loaded firearm was a predicate offense was harmless.[17] (See *Fiu*, *supra*, 165 Cal.App.4th at p. 388; *Bragg*, *supra*, 161 Cal.App.4th at p. 1402.)

### 3. *Defense Motion for Discovery of All Prior Informant Activities*

Defendant argues that the trial court erred when it denied his pretrial motion for discovery of all information relating to the prior informant activities of the prosecution's witnesses. We conclude that the trial court did not abuse its discretion by denying the motion because there was no evidence that the prosecutor did not comply or did not intend to comply with his obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and section 1054.1.

---

[17] The Attorney General argues that there was undisputed evidence of another predicate offense based on Investigator Delfin's testimony that he was threatened by a City Hall gang member named Arnolfo Ayala, which could qualify as a criminal threat (§ 422). A violation of section 422 qualifies as a predicate offense under section 186.22, subdivision (e)(24). The jury, however, was not instructed that a criminal threat could constitute a predicate offense. Thus, we do not consider the criminal threat in analysis of prejudice.

A. *Background*

On October 12, 2017, defense counsel filed a pretrial discovery motion seeking "discovery of all reports, documents, writings, recordings and statements (whether written or oral) of 'all prior informant activities' of all individuals whom the prosecution intend[ed] to call at trial to testify about matters going to the issue of" defendant's guilt. The motion defined all prior informant activities as "any and all prior informant activities that occurred at any time before the informant testifies at the trial in this matter, and not merely prior informant activities that occurred before the alleged crime in this case was committed, or prior informant activities that occurred before defendant was arrested in connection with the case, or prior informant activities that occurred before the filing of any accusatory pleading in this case." Defense counsel also sought "discovery of all the police reports, transcripts and recordings generated in any and all of the investigations and cases in which the person who engaged in the 'prior informant activities' gave the police that prior information whether or not those investigations or cases (1) have been completed or closed, (2) remain open, (3) are the subject of continuing investigation, or (4) are pending trial at this time."

On November 20, 2017, the trial court held a hearing on the matter. Defense counsel argued: "The best way to know whether these people have a history of lying is to look at the statements they gave in relation to the overall case investigation [in prior cases] to see whether these people, these informants on these other cases are now being used in this case have statements that are just totally inconsistent with what the reports show in those cases. Whether they are completed cases, ongoing cases, cold cases. And that would be very critical information to confront them with at trial in this case."

In response, the trial court stated: "[Y]our motion and what you're asking me to do assumes that the District Attorney's going to ignore its *Brady* obligations," and that if the prosecutor came across a statement made by an informant that "has been proven to be

demonstratively false[, the prosecutor is] not going to turn that over to you." Defense counsel stated that he wanted to review the materials because "[s]ometimes defense attorney's analysis of what is or isn't inconsistent is different from a prosecution's point of view." The prosecutor agreed with the trial court's analysis and stated that "if [he] did see something like that [evidence that would exonerate the defendant or impeach a witness], absolutely the information should be turned over."

Thereafter, the trial court denied defense counsel's motion, reasoning as follows: "The People are required to comply with their *Brady* obligations and produce all exonerating or impeaching information that they have knowledge of. They're required to review their records and files to determine whether or not the informants have provided false information in other cases. And if they do, I'm confident they'll comply with those obligations. But I'm not going to issue an order compelling them to produce records and reports in all cases in which these informants have provided information."

B. ***General Legal Principles and Standard of Review***

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) "The [United States Supreme Court] has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable

37

evidence known to the others acting on the government's behalf in this case, including the police.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' [Citation.] Evidence subject to disclosure includes '[s]tatements of all defendants' (§ 1054.1, subd. (b)), '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' (*id.*, subd. (c)), any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts' (*id.*, subd. (f)), and '[a]ny exculpatory evidence' (*id.*, subd. (e))." (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.)

"[A]buse of discretion is generally the proper standard of appellate review on matters regarding discovery in criminal cases." (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1212.) *Brady* claims are subject to the independent standard of review. (*Salazar*, *supra*, 35 Cal.4th at p. 1042.)

C. *Analysis*

Defendant argues that the trial court erred in denying his discovery motion because an informant can be impeached by evidence that he or she provided inconsistent or false facts in prior cases. Defendant, however, does not argue that the prosecutor violated his *Brady* obligations, or that there was exculpatory or impeaching evidence that was not disclosed to the prosecution in this case. Defendant's motion essentially asked the trial court to mandate that the prosecutor disclose *all* information about informants—not just relevant information—and have *defense counsel*, not the prosecutor, review the materials to determine whether the evidence was exculpatory or impeaching.

38

The prosecutor, however, acknowledged that he was aware of his *Brady* obligations, and he agreed that evidence that an informant made a false statement in a prior investigation would be turned over to the defense. Here, there is nothing to indicate that the prosecutor intended to ignore his duty under *Brady* and would suppress material evidence favorable to the defense. (*Brady*, *supra*, 373 U.S. at p. 87.) Furthermore, the evidence requested by defense counsel exceeded the scope of section 1054.1, which requires disclosure of "exculpatory evidence" (*id*., subd. (e)) and "[r]elevant written or recorded statements of witnesses" (*id*., subd. (f)). Prior informant activities where the informant provided relevant, consistent information to the police would not have been relevant or exculpatory because it would not have impeached the informant's credibility.

Defendant relies on *Maxwell v. Roe* (9th Cir. 2010) 628 F.3d 486 (*Maxwell*). In *Maxwell*, a jailhouse informant denied that he previously worked as an informant and stated that he had never testified for the district attorney, representing himself as "someone new to the informant world." (*Id*. at p. 511.) The defendant filed a petition for a writ of habeas corpus after he was convicted, and the trial court held an evidentiary hearing on whether the jailhouse informant had given false testimony. (*Id*. at pp. 493-494.) At the evidentiary hearing, it was revealed that the prosecution had not disclosed that the jailhouse informant had aided in several investigations and had acted as an informant on numerous previous occasions. (*Id*. at p. 511.) The Ninth Circuit concluded that evidence of the informant's prior dealings could have been used to discredit the informant at trial. (*Id*. at pp. 511-512.) Thus, the failure to disclose information about the informant amounted to a *Brady* violation. (*Maxwell*, *supra*, at pp. 511-512.)

*Maxwell* does not aid defendant. The decision in *Maxwell* took place after an evidentiary hearing where evidence was presented that the prosecutor failed to disclose relevant, exculpatory information, which could have impeached the informant's

39

credibility. (*Maxwell*, *supra*, 628 F.3d at pp. 493-494.) Here, there is no evidence that the prosecutor withheld exculpatory information. Furthermore, defendant cites to no authority for the proposition that the prosecution is required to disclose evidence that is not relevant to the case, or that it is the duty of defense counsel, not the prosecutor, to examine the materials available to the prosecutor to determine whether exculpatory evidence exists.[18]

Accordingly, the trial court did not abuse its discretion when it denied defendant's discovery motion.[19] (*People v. Ashraf*, *supra*, 151 Cal.App.4th 1205.)

### 4. *Defense Expert*

Defendant argues that the trial court erred when it excluded the expert testimony of a psychologist, Dr. Jeffrey Neuschatz, on the "psychological impact and effect upon

---

[18] We acknowledge that "the courts have recognized that the *Brady* requirements can also be satisfied when a *trial court* conducts an in camera review of documents containing possible exculpatory or impeachment evidence." (*J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1336.) Generally, courts have recognized that in camera inspection is appropriate when there is a " '*special interest in secrecy*' afforded to the files." (*Ibid*.) For example, in *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, the Supreme Court required that the defendant make a threshold showing of materiality to trigger the trial court's duty to search the records of a state child protection agency after the defendant was charged with sexual offenses against the child. (*Id*. at pp. 43, 59-61.) Similarly, in *J.E. v. Superior Court*, the Fourth Appellate District concluded that in camera review under Welfare and Institutions Code section 827 was the proper mechanism to resolve a defense *Brady* disclosure request involving a juvenile file. (*J.E. v. Superior Court*, *supra*, at p. 1338.) Welfare and Institutions Code section 827, which governs access to juvenile records, requires a petitioner to make a good cause showing warranting the in camera review. (*J.E. v. Superior Court*, *supra*, at p. 1337.)

[19] As we have stated, *Brady* claims are subject to the independent standard of review. (*Salazar*, *supra*, 35 Cal.4th at p. 1042.) However, as explained above, there is no evidence that a *Brady* violation occurred. Thus, there is no *Brady* claim for us to review, and we apply the abuse of discretion standard to the trial court's denial of defendant's discovery motion. (*People v. Ashraf*, *supra*, 151 Cal.App.4th at p. 1212.)

40

ordinary citizens of testimony from an accomplice and/or testimony from an informant." We find that the trial court did not abuse its discretion by excluding the testimony.

### A. Background

During defendant's trial, defense counsel sought to admit Dr. Neuschatz's expert testimony on the psychological impact of informant testimony, cooperating witness testimony, and secondary confessions. Dr. Neuschatz defined a secondary confession as "a report by one person that he or she heard another person (the suspect) confess to a crime." Defense counsel included a report prepared by Dr. Neuschatz summarizing his proposed testimony. In the report, Dr. Neuschatz opined that people place "undue weight on confessions" and research showed that individuals rely on involuntary confessions to the same extent that they rely on voluntary confessions. Dr. Neuschatz asserted that the research showed that confessions "have a significant impact on people's verdict decisions."

Dr. Neuschatz also summarized a study of jury behavior that involved the use of mock jurors. The study found that "there were significantly more guilty verdicts when an informant testified than when one did not." Dr. Neuschatz attributed this to "[f]undamental attribution error," which occurs "when a juror underestimates the importance of situational factors (such as the informant receiving an incentive or having been an informant multiple times in the past) and overvalues dispositional factors (such as the informant's honesty or guilty conscience)." Likewise, Dr. Neuschatz claimed that "confession evidence has a greater impact on people than other forms of evidence" based on a recent study that he conducted using mock jurors.

According to Dr. Neuschatz, research also showed incentives such as reduced prison sentences or dropped charges can lead an informant to fabricate information and, based on a study that used students and the incentive of academic credit, "people will lie for even a minimal incentive." Furthermore, Dr. Neuschatz claimed that "[f]alse

41

informant testimony is a leading cause of wrongful convictions in the United States." Dr. Neuschatz concluded that it is difficult for individuals who are unfamiliar with the research "to appreciate the factors that can affect the reliability of informant testimony or cooperating witnesses."

The prosecutor moved to exclude Dr. Neuschatz's testimony. The prosecutor argued that Dr. Neuschatz's testimony was not "[r]elated to a subject that is sufficiently beyond common experience" of the jurors and was not the proper subject of expert testimony. (Evid. Code, § 801.) The prosecutor also argued that the evidence should be excluded under Evidence Code section 352 because it was irrelevant and prejudicial.

After considering the parties' arguments, the trial court excluded Dr. Neuschatz's testimony, concluding that his testimony was "nothing other than a comment on the credibility or believability of witnesses."

### B. General Legal Principles and Standard of Review

Expert testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

"In assessing defendant's claim that the trial court erroneously excluded [an expert's] testimony, we apply the deferential abuse of discretion standard." (*People v. Curl* (2009) 46 Cal.4th 339, 359 (*Curl*).)

42

*C. Analysis*

We conclude that the trial court did not abuse its discretion in excluding Dr. Neuschatz's testimony. As the trial court determined, Dr. Neuschatz's testimony was essentially a comment on the credibility of witnesses. Moreover, his proposed testimony was not a subject that went beyond the common experience of jurors. For example, it is a matter of common knowledge that an informant who receives a benefit in exchange for information has a motive to fabricate information. It is also a matter of common knowledge that individuals may lie if given an incentive to do so.[20]

In *Curl*, *supra*, 46 Cal.4th 339, a witness who was incarcerated at the same time as the defendant testified about conversations that he had with the defendant. (*Id*. at pp. 346-347.) At trial, the defendant sought to call an expert to testify about " 'how an inmate informant can obtain information used to concoct a confession that was never made.' " (*Id*. at p. 357.) The defendant argued that his proposed expert " 'qualified as an expert to render testimony about inmate informants, the process, the methods of selecting, evaluating and determining the truthfulness of their representations' and would render 'his opinion regarding the validity of [the witness] in his role of an inmate informant.' " (*Id*. at p. 358.) The California Supreme Court determined that the trial court did not abuse its discretion by excluding the testimony because "to the extent the purpose or effect of [the expert's] testimony was to render an opinion about [the witness's] credibility, the testimony was inadmissible." (*Id*. at p. 359.)

---

[20] For these reasons, the trial court gave standard jury instructions that advised the jury on how to consider such issues. CALCRIM No. 226 advised the jury that to evaluate the credibility of a witness, the factors to be considered included: "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?"; and "Was the witness promised immunity or leniency in exchange for his or her testimony?"

43

Likewise, in *People v. Johnson* (1993) 19 Cal.App.4th 778 (*Johnson*), the defendant sought to introduce expert testimony from two witnesses, a sociology professor who had studied the prison environment and an " 'expert' liar." (*Id*. at p. 786.) The trial court described the sociologist's proposed testimony as " 'a sociological study . . . about what happens in prisons.' " (*Ibid*.) Defense counsel proffered that his expert liar, an inmate informant, would testify about " 'having snitched or engaged in dealing with the district attorney many times with the Los Angeles Police Department.' " (*Ibid*.) The trial court excluded both witnesses' testimonies, and the Court of Appeal found no abuse of discretion. (*Id*. at p. 791.) As for the sociologist, the Court of Appeal noted: "[t]here was no showing the proposed sociologist witness had researched the particular inmate[] [witnesses] in question, or had made any scientific study of their credibility; and the inherent problems with such expert testimony as to the credibility of other witnesses, and the prospective abandonment of common sense by lay jurors for reliance on paid 'expert' testimony covering a subject well within a jury's ken, amply justified the trial court's decision to exclude it." (*Ibid*.) As for the expert liar, the Court of Appeal concluded that the proposed testimony "was irrelevant to the specific issues before the jury, and of very dubious (if any) scientific value." (*Ibid*.)

Here, Dr. Neuschatz's proposed testimony is akin to the testimonies excluded in *Curl* and *Johnson* on the veracity and credibility of witnesses. (*Curl*, *supra*, 46 Cal.4th at pp. 358-359; *Johnson*, *supra*, 19 Cal.App.4th at pp. 786-791.) Essentially, Dr. Neuschatz would have rendered an opinion about the credibility of witnesses, and his proposed testimony was not the proper subject of an expert opinion because "whether a witness is telling the truth . . . is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 82; Evid. Code, § 801, subd. (a).) Thus, we find that the trial court did not abuse its discretion when it excluded the testimony.

44

### 5. *Uncorroborated Accomplice Testimony*

Defendant argues that his convictions must be reversed because the testimony of some of his fellow gang members, including Gonzalez, Moreno, Rodriguez, and Contreras, were not corroborated by independent evidence. We disagree and conclude there was sufficient independent corroborating evidence.

### A. *Background*

The jury was instructed with a modified version of CALCRIM No. 334, which stated that before the jury could consider the testimony of Gonzalez, Moreno, Rodriguez, and Contreras as evidence against defendant, the jury must first determine if the witnesses were accomplices to the crime.[21]

CALCRIM No. 334 then stated that if the jury determines that a witness was *not* an accomplice, "then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness." On the other hand, if the jury determines that a witness *was* an accomplice, the jury was instructed that "you may not convict the defendant of the crimes charged based on [the accomplice's] statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting

---

[21] The jury was instructed that a person is an accomplice if: "1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime." The instruction stated that "[t]he burden is on the defendant to prove that it is more likely than not that [Gonzalez, Moreno, Rodriguez, and Contreras] were accomplices."

evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime."

### B. General Legal Principles and Standard of Review

Section 1111 mandates that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

"This statute reflects the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' [Citation.] 'Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that, " 'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime.' " ' [Citation.] ' "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." ' " (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128 (*Rodriguez*).) This includes the defendant's statements and conduct. (*People v. Gurule* (2002) 28 Cal.4th 557, 628.)

" 'The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*).) The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies. (*People v. Davis* (2005) 36 Cal.4th 510, 543.)

46

" ' "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." ' " (*People v. Szeto* (1981) 29 Cal.3d 20, 27 (*Szeto*).)

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*Abilez*, *supra*, 41 Cal.4th at p. 505.)

### C. Analysis

Assuming that the jury found Gonzalez, Moreno, Rodriguez, and Contreras to be accomplices to the charged crimes, we conclude that their testimonies were sufficiently corroborated by independent evidence that showed that defendant was the driver of the burgundy SUV and was the shooter, which " 'reasonably tend[ed] to connect . . . defendant with the commission of the crime[s].' " (*Abilez*, *supra*, 41 Cal.4th at p. 505.)

D.A. testified that when he and W.M. walked down Palm Avenue, they saw a burgundy or red SUV, and the driver was a "[b]ig Hispanic guy with a red shirt and facial tattoos." D.A. recalled that the driver had tattoos above his eyebrows that "made his eyebrows look big." Inspector Chappell testified that defendant had the type of facial tattoos described by D.A.; he had the words "Watson Locos" tattooed over his eyebrows.

Multiple witnesses, including N.M. and J.C., testified that on the day of W.M.'s murder, they saw a burgundy or red SUV drive recklessly around the area of Palm Avenue. J.H., C.R.'s friend, testified that she saw a reckless car driving in front her house, and in previous statements, she identified defendant as the driver.

Sergeant Montalbo testified that he did not know of any other gang member in Watsonville that drove a red SUV aside from defendant. Sergeant Montalbo had stopped defendant in a burgundy SUV twice before W.M. was killed, once in February 2005 and another time in March 2005. C.R. testified that their family had three cars, including a

47

burgundy or red Yukon. When the burgundy Yukon was searched after it was impounded, Sergeant Bedolla found paperwork with defendant's name, defendant's driver's license, and a receipt that was dated the same day as the murder. Gunshot residue was also found in the SUV.

In sum, there was ample evidence that D.A. and W.M. were shot at from a burgundy or red SUV, evidence that the SUV was the same as the one seized from C.R., and evidence that defendant was the driver of the SUV. Based on our careful review of the record, we believe that the independent evidence sufficiently corroborated the testimonies of Gonzalez, Moreno, Rodriguez, and Contreras because it " 'reasonably tend[ed] to connect' " defendant with the charged crimes. (*People v. Szeto*, *supra*, 29 Cal.3d at p. 27, italics omitted.)

## DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.




WE CONCUR:




_____

ELIA, ACTING P.J.




_____

DANNER, J.




*People v. Rosas*
**H046320**