[No. C052207. Third Dist. June 8, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
MOHAMMED QUMAR ASHRAF et al., Defendants and Respondents.

1206

**COUNSEL**

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Dane R. Gillette and Mary Jo Graves, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, John G. McLean and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Appellant.

Douglas R. Hoffman for Defendant and Respondent Mohammed Qumar Ashraf.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Respondent Khialuddin Niazi.

Dean R. Johansson for Defendant and Respondent Sarajuddin Niazi.

Stewart Katz for Defendant and Respondent Zafaruddin Niazi.

**OPINION**

**ROBIE, J.**—The trial court dismissed numerous criminal charges against defendants Mohammed Qumar Ashraf, Zafaruddin Niazi, Sarajuddin Niazi, and Khialuddin Niazi based on its finding that the People had violated the criminal discovery statutes by failing to provide defendants with reports of various witness statements regarding defendants' supposed affiliation with the Taliban.

On appeal, the People contend the trial court erred in dismissing the case. According to the People, dismissal is a proper sanction for a criminal discovery violation only when it is required by the United States Constitution, and dismissal was not required here because the evidence that was not disclosed was not favorable to defendants. We agree and therefore reverse the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

The criminal charges in this case arose from an incident in March 2004, when defendants allegedly participated in a group assault on several individuals in West Sacramento, including a 47-year-old Afghani expatriate named Sayed Sayah. According to the People, the assault was precipitated by a conversation earlier in the day between Sayah and defendant Ashraf about Sayah's plans to return to Afghanistan to work as an interpreter for United States military forces there. In the course of that conversation, Ashraf allegedly expounded on the evils of the United States and the merits of the Taliban and declared that Sayah was "a bad [M]uslim because he was willing to help the United States, which is the enemy of Islam."

On February 23, 2006, in advance of the trial scheduled to begin on March 7, defendants filed a motion in limine that requested (among other things) a bar on the use of the word "Taliban" absent an Evidence Code section 402 hearing "as to any evidence that would support a belief that any defendant was a member or acting in behalf of said organization."

The following day, the prosecutor filed a motion in limine in which he sought (among other things) leave to offer evidence of the conversation between Ashraf and Sayah to provide a motive for the attack—"religious and political hatred." In passing, the prosecutor noted that "[t]he specifics of th[e] conversation were recorded by Detective Erik Thruelsen of the [West Sacramento Police Department] when he interviewed [the victim]."

A week later, on March 3, 2006, the prosecutor filed an "addendum" to his motion in limine on the motive issue. According to the prosecutor, he had discovered just two days earlier (on Mar. 1) that "only a small fraction of what was said by several interviewed witnesses making reference to the Ashraf/Niazi Taliban connection as motive for the attack, was included in the police reports" the prosecution had received and produced to the defense in discovery. The prosecutor explained that while interviewing another one of the victims, Amarddin (Zerguy) Maazoudin, on March 1 about prior incidents

involving the Niazis, Maazoudin told the prosecutor about an incident in which Sarajuddin Niazi described himself "passionately as pro-Taliban." Maazoudin also told the prosecutor that Detective Thruelsen was present during an interview around the time the March 2004 incident was being investigated during which Maazoudin had described the earlier incident.

Apparently alarmed about this omission from the police reports, the prosecutor contacted Detective Thruelsen. The detective told the prosecutor that after the first two witnesses he interviewed mentioned the Taliban, he contacted "a joint FBI-Homeland Security Office task force (JTF)." Thereafter, the JTF (joint task force) either conducted or was present at the interviews of the victims and other witnesses. At the apparent request of the JTF, Detective Thruelsen excluded references to the Taliban from the reports of the interviews—to the extent any such reports were prepared. The prosecutor summarized the excluded information as follows:

(1) All but one of numerous references to the Taliban by Sayah in his initial interview with Detective Thruelsen were excised from the report of that interview.

(2) A second interview of Sayah was conducted by the JTF and Detective Thruelsen, in which Sayah apparently gave "a detailed account of Khialuddin Niazi's involvement with the Taliban in 2001 and 2002 in West Sacramento," but no report of that interview was provided to the prosecution.

(3) References to two encounters between Amarddin Maazoudin and Sarajuddin Niazi in late 2001–2002 were missing from the reports of Maazoudin's interviews. Both incidents showed "Sarajuddin Niazi's pro-Taliban sympathies and a high degree of passion on the subject of the Taliban's ouster from Afghanistan by the United States."

(4) Detective Thruelsen interviewed another victim, Julio Gomez, who "talked about witnessing the exchange between Amarddin Maazoudin and Sarajuddin Niazi in which Sarajuddin became visibly incensed over a political loss suffered by the Taliban in the signing of the 'Bonn Agreement.'" That portion of Gomez's interview was apparently excluded from the police reports.

(5) An interview of a witness (Aslum Maazoudin) was conducted by the JTF and West Sacramento police, in which the witness "described a 2002–2003 confrontation with Khialuddin Niazi during which i[t] became apparent that he was actively supporting the Taliban in various ways," but no report of that interview was provided to the prosecution.

According to. the prosecutor, "The net result was that any substantive information obtained from witnesses and victims providing evidence of hostility by the Taliban as the motivation for the attack appears to have been excluded from police reports provided to [the prosecution]."

On March 2, 2006, the prosecution conducted supplemental interviews of Sayah, both Maazoudins, and Gomez, focusing on the information that had been excluded from the police reports that was "corroborative of the motives for the attack based solely on perceived political differences." The prosecutor represented that the reports of those supplemental interviews were to be faxed to defense counsel on March 3.

On March 6, 2006, the day before trial, Ashraf filed a motion to dismiss the information "based upon the failure of the prosecution to provide discovery timely before the trial in this matter." Ashraf argued that by "withholding material information until the eve of trial on the excuse that they did not have possession of it, (even though their chief investigating detective did), [the prosecution] ha[s] breached [its] duty and the public trust."

The following day, the parties and the court took up the motion to dismiss, in which the three other defendants joined. The prosecutor assured the court "there was nothing wilful [on his part] in any way shape or form in the withholding of these statements." He also told the court he had directed Detective Thruelsen to contact the FBI or Homeland Security to "get them to respond to my request to release all the statements that they're in possession of," but there had been no response. Additionally, at various points the prosecutor interjected that the information or evidence Detective Thruelsen withheld was "inculpatory," not exculpatory.

After considering the matter, the trial court found there had been "a violation of the discovery statute" that was "not intentional by the Deputy District Attorney . . . but was intentional by law enforcement in general, and specifically Detective [Thruelsen]." In considering potential sanctions, the court observed that "the discovery may be exculpatory, [because] an argument can be made that since there has been no contact with the defendants by Homeland Security or the F.B.I. regarding an alleged Taliban connection, that may be favorable to the defendants." After determining that "all less restrictive sanctions would not be effective," the court found "there's been a due

process violation and that a dismissal is called for." Accordingly, the court dismissed the case "without prejudice, to give the district attorney an opportunity to obtain the withheld reports if he's able to do so."

The People filed a timely notice of appeal from the dismissal.

## DISCUSSION

### I

#### *The Discovery Statute*

Discovery in California criminal prosecutions is governed by Penal Code[1] section 1054 et seq. Under section 1054.1, the prosecutor must "disclose to the defendant or his or her attorney" certain "materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." That material includes "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at trial," as well as "[a]ny exculpatory evidence." (§ 1054.1, subds. (f), (e).)

Subdivision (b) of section 1054.5 provides that "[u]pon a showing that a party has not complied with Section 1054.1 . . . , a court may make any order necessary to enforce the provisions of this chapter . . . ." Subdivision (c) of that statute provides, however, that "[t]he court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States." (§ 1054.5, subd. (c).)

As the People point out, "the only substantive discovery mandated by the United States Constitution" is the disclosure of "material exculpatory evidence" under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]. (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1314–1315 [96 Cal.Rptr.2d 264].) They contend that because "there is no showing that the missing reports would have contained any [material] exculpatory information," there was no *Brady* violation here and therefore no basis for dismissing the case.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The People do not argue, and therefore we do not address, the propriety of the trial court's determination that there was "a violation of the discovery statute" in this case. It bears noting, however, that section 1054.1 requires the prosecuting attorney to disclose material and information only "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." It appears here that the prosecuting attorney did not possess any "missing reports" and did not know if any such

## II

### *Standard Of Review*

Khialuddin Niazi first contends the People's argument "misses the point" because the issue is whether the trial court abused its discretion in choosing dismissal as a sanction for the People's discovery violation. He is mistaken. Although abuse of discretion is generally the proper standard of appellate review on matters regarding discovery in criminal cases (see *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 366 [51 Cal.Rptr.3d 637]), that standard is manifestly *not* the proper one here, because subdivision (c) of section 1054.5 *forbids* the use of dismissal as a discovery sanction unless the dismissal is *required* by the federal Constitution. The judge had no discretion to exercise. Thus, the question here is not whether the trial court abused its discretion in dismissing the case, but whether the trial court erred as a matter of law in dismissing the case because the federal Constitution did not require dismissal. To answer that question, we must determine whether a *Brady* violation occurred. If there was no *Brady* violation, then there was no conceivable basis for concluding the federal Constitution required dismissal.

## III

### *There Was No* Brady *Violation*

■ Under *Brady*, " 'the prosecution must disclose to the defense any evidence that is "favorable to the accused" and is "material" on the issue of either guilt or punishment.' [Citation.] Under *Brady*, 'Evidence is "favorable" if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [¶] Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' " (*Kennedy v. Superior Court, supra*, 145 Cal.App.4th at p. 367.)

Of course, to determine whether evidence that was not disclosed to the defense was favorable and material under *Brady*, we must have some idea of what that evidence was. Here, we do not even know for certain whether there ever *was* any evidence—in the form of written or recorded statements of witnesses or reports of those statements—that the People failed to disclose. From the record, all we really know is that the prosecutor *did not receive*

reports were in the possession of the investigating agencies. Thus, it could be argued there was no violation of the discovery statute. As we said, however, the People do not argue this point, so we do not address it further.

reports of certain statements given by Sayah, Gomez, and Amarddin and Aslum Maazoudin; we do not know whether any such reports actually exist or ever existed.

Even if we assume they do (or did) exist, however, from the record it appears those reports would consist of the following: (1) whatever references to the Taliban Detective Thruelsen excised from his report of his initial interview of Sayah; (2) any report of the second interview of Sayah, in which he described Khialuddin Niazi's involvement with the Taliban in 2001 and 2002; (3) any report of the interview or interviews of Amarddin Maazoudin in which he described encounters with Sarajuddin Niazi in late 2001–2002 that showed Sarajuddin's pro-Taliban sympathies; (4) any report of the part of Detective Thruelsen's interview of Gomez where Gomez discussed Sarajuddin becoming visibly incensed over a political loss suffered by the Taliban; and (5) any report of the interview of Aslum Maazoudin in which he described a 2002–2003 confrontation with Khialuddin Niazi that indicated Khialuddin was actively supporting the Taliban.

■ We are at a loss to understand how any of the matter described above could be deemed "favorable" to defendants for *Brady* purposes. So far as we know, the excluded matter all related to defendants' support of and/or sympathy for the Taliban. To the extent defendants' status as Taliban sympathizers/supporters is relevant at all in this case, it appears relevant only as circumstantial evidence of defendants' possible motive for attacking Sayah because of his plans to work as an interpreter for United States military forces in Afghanistan. "While it is not indispensable that motive be proven as an element necessary to justify a conviction of one charged with crime, the presence or absence of motive is a circumstance going to the question of the guilt or innocence of the defendant." (*People v. McQuate* (1934) 2 Cal.2d 227, 234 [39 P.2d 408].)

Here, evidence that defendants had a motive to attack Sayah would, at the very least, be relevant to refute defendants' claim they acted in self-defense. Since the matter contained in the interviews not disclosed to defendants tended to show the presence, rather than the absence, of motive, that matter can only be characterized as *unfavorable* to defendants. The prosecution has no federal constitutional duty to disclose to a defendant evidence that is unfavorable to him. (*People v. Burgener* (2003) 29 Cal.4th 833, 875 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

Khialuddin Niazi theorizes that the undisclosed reports might have been favorable to defendants for impeachment purposes. He claims "[t]here is more than a reasonable probability that able defense counsel would find some inconsistency in the witnesses' prior statements that would assist the defense in defending against the charges." It is true that evidence tending to impeach the credibility of a prosecution witness may be deemed favorable to the defense under *Brady*. (See *Giglio v. United States* (1972) 405 U.S. 150, 154–155 [31 L.Ed.2d 104, 108–109, 92 S.Ct. 763].) "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ." (*Napue v. Illinois* (1959) 360 U.S. 264, 269 [3 L.Ed.2d 1217, 1221, 79 S.Ct. 1173].) The problem here, however, is that defendants cannot point to anything in the undisclosed reports they could have used to impeach Sayah, Gomez, Amarddin Maazoudin, or Aslum Maazoudin, and mere speculation that there *might have been* something useful for impeachment purposes in those reports is not sufficient to demonstrate a *Brady* violation. (See *People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1472 [6 Cal.Rptr.3d 138] ["*Brady* . . . does not require the disclosure of information that is of mere speculative value"].)

As for the trial court's suggestion that the discovery might have been favorable to defendants because "there has been no contact with the defendants by Homeland Security or the F.B.I. regarding an alleged Taliban connection," the court's reasoning was faulty. *Brady* requires the disclosure of evidence that is favorable to the defendant. The evidence that was not disclosed here was evidence of defendants' support of and/or sympathy for the Taliban, which, as we have explained, was not favorable to defendants. That evidence is not transformed into something favorable to defendants simply because federal officials may not have contacted defendants about their connections with the Taliban. While the evidence of a lack of contact might itself be favorable to defendants (to rebut evidence of their Taliban affiliations), evidence of a lack of contact is not the evidence the People failed to disclose, and the finding of a *Brady* violation cannot be premised on the potential exculpatory nature of such *other* evidence.

■ At bottom, the question here is whether the evidence the People failed to disclose—evidence that defendants supported or sympathized with the Taliban—was favorable to defendants. We conclude it was not. Accordingly, there was no *Brady* violation, and therefore no conceivable theory under which the federal Constitution required dismissal of this case for the People's failure to disclose that evidence. Accordingly, the trial court erred in dismissing the case.

## DISPOSITION

The judgment of dismissal is reversed.

Davis, Acting P. J., and Butz, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 29, 2007, S154270.