Filed 8/19/25  P. v. Ricks CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085921 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BAF1701368) |
| RONALD RICKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, James Stafford Hawkins, Judge.  (Retired judge of the Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, and remanded for resentencing.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ronald Ricks appeals the judgment and sentence imposed following his jury trial conviction of first degree murder (Pen. Code,[1] § 187, subd. (a)) with true findings on a firearm enhancement for personal and intentional discharge of a firearm causing great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)) and a "drive-by" special circumstance for murder perpetrated by discharge of a firearm from a motor vehicle (§ 190.2, subd. (a)(21)).

Ricks raises multiple issues on appeal. First, Ricks argues that a text message sent to his girlfriend was improperly admitted into evidence, and that his attorney was ineffective for failing to object. The text message, however, was properly admitted for the nonhearsay purpose of impeaching his girlfriend's testimony. Additionally, any error was harmless.

Second, Ricks asserts the trial court improperly included the "witness certainty" factor in CALCRIM No. 315 regarding eyewitness identification evidence. Ricks, however, requested the instruction be given without modification, including the certainty factor. The trial court committed no error by giving the instruction as requested by Ricks. Moreover, any error would be harmless because no eyewitness identified Ricks or expressed any certainty about the identification.

Third, Ricks claims the People violated their discovery obligations through the mid-trial disclosure of a witness cooperation agreement. There was no violation under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) or section 1054.1 because the evidence was immaterial, disclosed and presented at trial, and there is no reasonable probability of a different result if it had been disclosed earlier.

---

[1]     Unless specified, further statutory references are to the Penal Code.

Fourth, Ricks contends the prosecutor committed misconduct by eliciting gang-related testimony in violation of the court's pretrial ruling excluding such evidence. Ricks, however, forfeited this argument because he failed to object at trial. Moreover, there was no prosecutorial error because the testimony in question did not violate the court's order.

Fifth, Ricks asserts the drive-by special circumstance (§ 190.2, subd. (a)(21)) was overbroad on its face and as applied. He forfeited the as-applied challenge and we reject the facial challenge. Additionally, we conclude the statute is not unconstitutionally vague.

Finally, Ricks claims the trial court lacked informed discretion when it imposed but stayed the firearm discharge enhancement. The Attorney General concedes this point. We agree and accept the concession. Because full resentencing is necessary under *People v. McDavid* (2024) 15 Cal.5th 1015 (*McDavid*), Ricks's other resentencing arguments are moot.

We remand for resentencing but otherwise affirm.

FACTS AND PROCEDURAL BACKGROUND

In January 2017, Michael Gordon was fatally shot in a drive-by shooting outside the residence he shared with his fiancé Ashley Phillips.

Shortly before the shooting, as she was leaving their residence, Phillips saw a white truck nearby drive slowly at first, then speed up and drive away. A little while later, Gordon walked out of the residence with an acquaintance. He was helping the acquaintance put her dogs in her vehicle when a white truck approached slowly, and gunshots rang out. The acquaintance ducked until the gunfire stopped, and then she got up, went to the other side of her vehicle and saw people pointing toward a white Dodge truck. She could not see the truck's driver but saw Gordon standing behind her vehicle, bleeding and looking scared. He asked her to take him to the hospital and then he fell

to the ground and stopped moving.  By the time officers arrived, Gordon was face down in a pool of blood, was not breathing, and was not responsive to verbal commands.  He was pronounced dead at the scene.

Multiple witnesses described the driver of the white Dodge truck as a White or Hispanic male.  Surveillance video also captured the white Dodge truck travelling on the street, stopping, and then speeding away.

At the time of the murder, Ricks was driving a white Dodge rental truck he borrowed from his girlfriend Salena Holmes.  After the murder, police investigators found the rental truck outside the home of Ricks's best friend's mother.  Ricks went there shortly after the murder, asked to use her phone and said he needed a ride.  Police investigators found gunshot residue on the driver's window frame and the steering wheel of the truck.

Forensic analysis of Holmes's phones revealed text messages indicating Ricks wanted to harm Gordon.  Ricks had broken up with Holmes about a week before the murder because he believed Holmes and Gordon, who were good friends and had previously dated, had recently been together.  A couple days before the murder, Ricks texted Holmes, "I know you were with [Gordon]."  "Is there a guy with you?  If so, I would like to beat them up."  "Bring [Gordon] and get it, please."  Holmes responded, "I ain't with [Gordon], so I don't know what you mean."

The messages continued until the day before the murder, with Ricks texting Holmes, "I want you to tell all your friends that if you're at that house with any guy, friend, whatever, I'm going to take—fight them."  "That you can take to the bank."  "You have no choice.  This is what you wanted me to care. Well, now I don't care and I'm going to show you when shit you don't deserve the respect I gave you.  So yes, I felt that you think you can do and act how because consequences don't affect you while your choices have put someone

on the block and you know in your heart.  Goodbye."  "It's about time you make a decision for yourself, and I do promise you this will not be the last time you talk to me.  Tomorrow when I get your bitch, because you can believe this is worth dying for, so, yes, you are worth killing for."

An investigator from the district attorney's office testified the phrase "put someone on the block" was "short for chopping block" and meant "either to hurt someone significantly or to kill them."

Holmes also exchanged text messages with Gordon.  Two days before the murder, Holmes wrote to Gordon, "One of my so-called friends told [Ricks] I was with you on Sunday, and he just broke up with me."  Gordon responded, "I'm going to smash [the person who snitched on us]."  The day before the murder, Holmes wrote to Gordon, "[Ricks] said he's going to fight anyone . . . in my truck and at my house."  Gordon responded, "He wants to fight me?"  Holmes wrote, "Yeah, he does.  You and any guy I'm going to roll with. . . .  He don't care anymore, he said."

Shortly after Gordon was shot, Holmes received a text message from a person identified as "Leanna" that said, "Answer the call from James's phone.  It's [Ricks] calling and it's an emergency.  [Holmes], answer it."  There were several incoming and outgoing calls between Holmes and a phone belonging to someone named James L.  Holmes wrote back saying she was on her way.

Shortly after the murder, Holmes was in police custody.  An inmate informed police Holmes, while in custody, talked about a murder where the victim was her friend, and the shooter was her boyfriend who told her it was as easy as killing or skinning a cat.

In June 2018, the district attorney filed an information charging Ricks with murder (§ 187, subd. (a)).  In connection with the murder charge, the information alleged that Ricks personally and intentionally discharged a

5

firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)). In addition, the information alleged two prison priors (§ 667.5, subd. (b)), a serious felony prior (§ 667, subd. (a)) and a strike prior (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)).

In August 2023, a jury found Ricks guilty of first degree murder and found the special circumstance and the gun enhancement to be true. Ricks admitted the prior conviction allegations. The trial court sentenced him to life without the possibility of parole plus a stayed indeterminate sentence of 25 years to life for the section 12022.53 firearm enhancement.

DISCUSSION

I.

*Whether Text Message Was Properly Admitted*

Ricks argues the trial court improperly admitted hearsay in the form of a text message from Leanna to Holmes urging her to answer her phone, telling her that it was Ricks calling from James's phone and stating that it was an emergency. He contends there is no applicable hearsay exception and that Holmes's state of mind in response to the text was not relevant to any disputed issue in the case. He further contends it was prejudicial given its timing, its reference to an emergency involving Ricks and the inference it raised that he was involved.

A. *Additional Factual Background*

On direct examination by the prosecutor, Holmes denied Ricks admitted to her he killed Gordon. She also claimed to remember almost nothing about the circumstances leading up to and following Gordon's murder, including the following: telling police that Ricks was the last driver

6

of the rental truck; that there were text messages between her and Ricks about Gordon before he was killed; that she received text messages from Ricks's phone that he was angry or jealous; that she texted Gordon that Ricks was angry after seeing them together; and that Ricks texted her that he was going to have to put someone on the block and that Holmes was worth killing for.

On redirect examination of Holmes, the following exchange occurred:

> "Q: Do you remember . . . minutes after [Gordon] was killed, Leanna . . . sent you a text saying, "Answer the call from James's phone. It's [Ricks] calling."?
>
> "A: No.
>
> "Q: Do you remember her sending a second text: "It's an emergency, [Holmes]. Answer it."
>
> "A: No.
>
> "Q: Do you remember shortly after that text from Leanna, you received an incoming call from James . . . ?
>
> "A: No.
>
> "Q: So you get a text from Leanna . . . saying, "Answer the call from James's phone. It's [Ricks] calling," and then immediately after that, you get a call from James . . . ?
>
> "[Defense counsel]: Objection. Misstates the evidence.
>
> "The Court: Well, you don't remember that; right?
>
> "The Witness: No.
>
> "The Court: So overruled.
>
> "Q: Do you remember making an outgoing call to James . . . shortly after this text from [Leanna]?
>
> "A: No.

"Q: Do you remember right after that outgoing call texting James's phone, saying, "I'm on my way right now"?

"A: No.

"Q: About a half hour after that, . . . do you remember texting [your friend]?

A: No."

The prosecution then called the district attorney's investigator to impeach Holmes. He was asked, "And did you see a text message on [Holmes's] phone from the data that you extracted where . . . she sends a text to this person Leanna—so this would have been approximately 12 minutes after the shooting—Leanna sends a text saying—." Defense counsel objected on hearsay and relevance grounds. The court initially sustained the objection but reversed after the prosecutor argued he was "offering it for impeachment" and to explain Holmes's "state of mind and subsequent conduct" because Holmes denied receiving the message. After reviewing Holmes's testimony, the court overruled the objection.

The district attorney's investigator then testified there was a message from a person labeled "Leanna" to Holmes shortly after the shooting that said, "Answer the call from James's phone. It's [Ricks] calling and it's an emergency. [Holmes], answer it." There were several incoming calls from a phone identified as James, and outgoing calls from Holmes to James's phone, and a message from Holmes to James's phone asking where he was, and saying she was on her way. Defense counsel objected on multiple grounds including lack of foundation, hearsay, speculation, and confrontation clause.

B. *Legal Principles*

Ricks argues on appeal that Leanna's text message to Holmes should have been excluded as inadmissible hearsay. Hearsay is defined as an out-of-

8

court statement offered to prove the truth of the matter asserted within the statement. (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless an exception applies. (*Id.*, subd. (b).) Out of court statements that are not offered to prove the matter asserted in them are not hearsay. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.)

We apply " 'the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations].' " (*People v. Zavala* (2013) 216 Cal.App.4th 242, 249.) " ' "[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at p. 249, citing *People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

C. *Analysis*

The Attorney General argues Ricks forfeited his hearsay argument "because he did not object when the prosecutor asked Holmes about Leanna's text message." We disagree. Holmes testified she had no recollection of the text messages, so no evidence of any out-of-court statement made by Leanna was admitted during the prosecutor's redirect examination of Holmes. The substance of Leanna's text was not admitted into evidence until later when the investigator was called to the stand to impeach Holmes. Defense counsel then made a timely hearsay objection. Accordingly, the issue was not forfeited.

On the merits, we find no error. Contrary to the Attorney General's argument, however, Leanna's text message to Holmes was not a prior inconsistent statement under Evidence Code section 1235 because it was not

9

a prior statement *by Holmes.*[2] Instead, as the trial court necessarily determined in overruling Ricks's objection, the challenged text message was admitted for the nonhearsay purpose of impeaching Holmes's testimony and not for its truth. "A statement not offered for its truth is, definitionally, not hearsay." (*People v. Superior Court (Couthren)* (2019) 41 Cal.App.5th 1001, 1019.)

There was sufficient evidence for the trial court to conclude that Holmes was deliberately untruthful and evasive in her trial testimony. As noted, she denied remembering critical facts about the events surrounding the murder. As the court cautioned her, her testimony was "hard to believe. Both attorneys asked you a bunch of questions and basically you said, 'I don't remember anything.' " The court asked, "Weren't you shocked that Mr. Gordon was killed?" Holmes responded that she was. Yet she purported not to remember key facts. Regardless of the truth of the text message from Leanna, the fact that it was in fact sent to Holmes was relevant to impeach her testimony that she did not recall receiving it, and inferentially, that she did not recall other key facts either. It was thus admissible for the nonhearsay purpose of demonstrating that she received it and impeaching her claimed lack of memory. (See *People v. White* (1980) 101 Cal.App.3d 161, 170 [evidence of statements witness heard was "nonhearsay, probative of the officer's state of mind relating to the reasonableness of his conduct under the circumstances and consequently admissible for impeachment purposes"]; *People v. Kohn* (1968) 258 Cal.App.2d 368, 376 [evidence of telephone calls

---

2    Evidence Code section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

10

not hearsay when offered to prove calls were made, not to prove truth of anything caller said].)

Moreover, any error was harmless. The text message from Leanna said, "Answer the call from James's phone. It's [Ricks] calling and it's an emergency." Although the fact that Ricks contacted Holmes regarding an emergency shortly after the murder was incriminating to him, it did not identify him as the shooter. Other circumstantial evidence that Ricks was the shooter was far more damaging. In the days preceding the murder, Ricks and Holmes broke up because he believed Holmes had been with Gordon. Ricks texted Holmes about his jealousy and anger, stating his desire to harm Gordon and telling Holmes she was worth killing for. Holmes let Ricks use the white Dodge truck and he was the last person to drive it before the shooting. The shooter was the driver and sole occupant of the truck, matching Ricks's description as a White or Hispanic male. Shortly after the shooting, Ricks showed up at his friend's mother's house, about a mile away. He seemed rushed, asked to use her phone, said he needed a ride, and then was gone. Police found the truck abandoned across the street from her house with gunshot residue on the driver's side window frame and steering wheel. Even assuming any error in the admission of Leanna's text, therefore, we would find it to be harmless because there is no reasonable probability the jury would have reached a more favorable result without it.[3] (*People v. Watson* (1956) 46 Cal.2d 818, 835–838 (*Watson*).)

---

[3]　On appeal, Ricks does not assert that the admission of this evidence violated his confrontation rights under the federal or state Constitutions.

## II.

### *Witness Certainty Factor in CALCRIM No. 315*

Relying on *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), Ricks contends the trial court committed reversible error by including witness certainty among the factors listed in CALCRIM No. 315 that juries should consider in evaluating the reliability of eyewitness identification. He also argues this was a violation of due process because empirical studies have shown there is no correlation between eyewitness confidence and the accuracy of identification.

A. *Additional Factual Background*

Phillips testified the driver of the white truck was either White or Mexican and wearing a black shirt. Because of the distance, she could not give a better description.

A neighbor testified he did not see the driver of the truck. He only got a glance and did not notice any distinguishing characteristics. He testified he was not paying much attention because he was washing his car, and he did not identify anyone in the photo lineup. Another neighbor testified the sole occupant of the car was the driver, a White or Hispanic male. She only saw him for a few seconds and could not tell if he had any hair or facial markings. She was unable to provide any further description.

An officer testified the girl who was with Gordon when he was shot told him she was unable to see the driver.

Ricks requested CALCRIM No. 315 in its entirety. At the close of evidence, the court instructed the jury with CALCRIM No. 315, which stated that it could consider 14 specified factors when evaluating eyewitness identification testimony. Relevant here, the court instructed the jury as follows: "You have heard eyewitness testimony identifying the Defendant.

12

As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] How certain was the witness when he or she made an identification?"

Acknowledging the absence of eyewitness testimony regarding the identity of the driver or shooter, the prosecution argued this was a circumstantial evidence case. Defense counsel emphasized that although many of the witnesses knew Ricks, "[n]one of them are able to identify that driver behind the vehicle as Mr. Ricks, none of them, then all the way through now." Defense counsel argued none of the witnesses were able to identify the driver. "Again, all through this time, nobody identifies Mr. Ricks as the driver behind that wheel, and nobody identifies him as the shooter behind that wheel. Nobody." "The evidence that I heard, Mr. Ricks was never identified as the shooter. Mr. Ricks was never identified in that truck." During deliberations, the jury requested rereading of testimony regarding the two neighbors' descriptions of the driver.

B. *Legal Principles*

We review claims of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 382; *People v. Marquez* (2023) 89 Cal.App.5th 1212, 1218.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We also presume jurors understand and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

C.  *Analysis*

In *Lemcke, supra*, 11 Cal.5th 644, our Supreme Court evaluated CALCRIM No. 315 and expressed concern that allowing jurors to consider the eyewitness's level of certainty reinforced a common misconception that an "identification is more likely to be reliable when the witness has expressed certainty." (*Lemcke,* at p. 647.)  Consequently, the court concluded a "reevaluation of the certainty instruction [in CALCRIM No. 315] is warranted," citing to the "near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' " (*Lemcke,* at p. 647.)  The court referred the matter to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid*.)  Until such an evaluation could be completed, the Supreme Court directed trial courts to "omit the certainty factor from CALCRIM No. 315 *unless the defendant requests otherwise.*" (*Id*. at pp. 647–648, italics added.)

Here, Ricks requested CALCRIM No. 315 be given without modification, including the certainty factor.  Consistent with *Lemcke*, there was no error because Ricks requested the instruction. (*Lemcke, supra*, 11 Cal.5th at pp. 647–648.)

Further, *Lemcke* explained that any potentially misleading effect of the witness certainty factor in CALCRIM No. 315 is not present when a witness has expressed doubt, rather than confidence, about the accuracy of the identification. (*Lemcke, supra*, 11 Cal.5th at p. 669, fn. 19 ["The misleading effect we are concerned with here—that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is not present when a witness has

14

expressed doubt regarding the identification."].)  Here, no witness identified Ricks as the shooter.  None of them identified him before or during trial, and one failed to identify his picture in a photo lineup.  Regarding identifying features of the driver of the white truck, several of the witnesses wavered, failed to recall details, and provided explanations for their lack of confidence in their descriptions.  Thus, none expressed certainty about an identification and the potentially misleading effect of the instruction was not present in this case.  If anything, the inclusion of this factor in the instruction favored Ricks because it supported his argument to the jury that none of the witnesses made an identification, let alone one with any certainty.  Under *Lemcke*, there was no violation of Ricks's rights and no conceivable prejudice.

We also reject Ricks's contention that the instruction lessened the prosecution's burden of proof.  As in *Lemcke*, the jury here was instructed on the burden of proof and evaluating witness credibility.  The court's instructions as a whole ensured the jury understood the prosecution had the burden to prove beyond a reasonable doubt that Ricks was the person who committed the crime.  Accordingly, we find no prejudicial error in the court's inclusion of the witness certainty factor in CALCRIM No. 315.

III.

*Discovery of the Inmate's Cooperation Agreement*

Ricks asserts the prosecutor's untimely disclosure of the inmate's cooperation agreement and interview in her own case violated his constitutional and statutory rights because it "deprived counsel of the ability to interview [her], her counsel and potentially her co-defendants" and prevented counsel from investigating the specifics of the murder itself.

15

A.   *Additional Factual Background*

At trial, Holmes denied that Ricks told her killing Gordon was like skinning a cat.

The prosecutor then called an inmate who testified she and Holmes were housed together in jail in February 2017.  The inmate testified Holmes said her boyfriend murdered someone, that the victim was her friend who was "set up to go outside," and that her boyfriend told her that "it was as easy as skinning a cat."  The inmate further testified there were no promises made in exchange for her testimony.

An officer testified that he interviewed the inmate after they learned she may have relevant information.  He confirmed no promises were made to the inmate, no benefits were provided, and she did not ask for anything in exchange for her cooperation.

Defense counsel complained he did not receive discovery about the inmate's case.  He claimed the inmate may have received a benefit in exchange for her testimony about what Holmes told her in custody.

The court agreed Ricks was entitled to know if the inmate got a deal.  The trial prosecutor conferred with the prosecutor who handled the inmate's plea and informed the court that the district attorney's office had agreed to a reduced charge and lighter sentence because of the inmate's agreement to provide information on her own case related to the more culpable codefendants.  She completed an interview and entered into a plea agreement on her own case.  It had nothing to do with the information she provided about her conversation with Holmes.

The court held a hearing outside the presence of the jury.  The officer who interviewed the inmate for this case testified he knew nothing about her agreement with the district attorney.  When he spoke with her about Ricks's

case, he told her he did not want to speak about her case, he was not making any promises, and they did not discuss any benefit she would receive.

The prosecutor offered to have the inmate's agreement entered as an exhibit and said he had no objection to the defense exploring the subject with the officer, who was still on the stand on cross-examination. The prosecutor said he would search the transcript of the inmate's cooperation agreement and interview for any reference to Rick's case, "Then at that point, I feel like the People have exhausted all their options. We have given all the information to defense to give them the ability to do a thorough impeachment, thorough cross-examinations, and I think the record is clear in that regard."

The court stated, "Okay. That all sounds good. Also, [defense attorney] you can have [your investigator] talk to [the prosecutor on the informant's case] or serve her a subpoena if you want. But, you know, it's about all we can do now." The court also offered, "It's up to you if you want to ask him about that in front of the jury or if you just want to argue coincidence." Defense counsel replied it was "not the focal point" of his examination.

The prosecutor confirmed there was no mention of Holmes or Ricks in the transcript of the inmate's cooperation agreement or interview transcript. He provided the information to defense counsel and stated, "And, again, the People's position is that there's no evidence, no information whatsoever, that [the inmate] received any sort of compensation or leniency with the district attorney's office for the information that she gave up on this case."

Defense counsel argued the inmate had to embellish and make things up during the interview about Holmes "[b]ecause I've got to make sure the [district attorney] knows I'm on board. I'm a cooperator. I'm not here to cause any problems."

17

The court responded, "I think, as [the prosecutor] said, you're speculating. You're finding the boogeyman under the bed. You had a chance to cross-examine her, and she is still subject to recall. And he had no obligation, that I can tell, under [section] 1054 to provide you with any of the things that he already had." The court confirmed the inmate was available and could be in court again later that day.

Defense counsel said he did not want to call the inmate and if he could be given the inmate's initial statement and plea agreement, he was "prepared to move forward on those issues without having people come back in and testify or talk or all that stuff." "My understanding or perception is that the agreement regarding meeting and the plea agreement, both documents pertaining to [the inmate], that the copies of the originals would be submitted into evidence. . . . that's the extent of the evidence I intend to present, Your Honor."

The informant's plea agreement and cooperation agreement were admitted into evidence. The court concluded, "I don't find any discovery violations. You don't want to talk to [the inmate]. You don't want to talk to [the district attorney]."

B. *Legal Principles*

Under *Brady, supra*, 373 U.S. 83, and its progeny, "the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709.)

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

18

(*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 (*Strickler*).) "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

On appeal, it is the appellant's burden to show a *Brady* violation. (*Strickler, supra*, 527 U.S. at p. 289.) We independently review the record in determining whether there was a *Brady* violation but, in so doing, give great weight to trial court's findings of fact that are supported by substantial evidence. (*People v. Masters* (2016) 62 Cal.4th 1019, 1067.)

"Section 1054.1 provides that the prosecuting attorney 'shall disclose' to the defendant certain materials and information listed in subdivisions (a) through (f) of that section," including exculpatory and real evidence. (*Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1242; § 1054.1, subds. (c), (e).) "These statutes do not specify the means by which the parties must 'disclose' discoverable information to each other, or specify that the party making disclosure must produce a copy of the discoverable item for the benefit of the opposing party." (*Schaffer,* at p. 1242.) Thus, so long as appellant was given an opportunity to access the information, there was no disclosure violation under section 1054.1. (*Schaffer,* at pp. 1242–1243 [enactment of section 1054 et seq. did not alter the prosecution's duty to make discovery available, i.e., making the information available for inspection and copying].)

19

Trial courts have broad discretion in determining if a party has violated the discovery statutes and whether to impose sanctions for any such violation. (*People v. Ayala* (2000) 23 Cal.4th 225, 299; *People v. Curl* (2009) 46 Cal.4th 339, 357.) Upon a showing of a party's failure to comply with informal discovery procedures, a trial court "may make any order necessary to enforce the provisions" of the statute, "including, but not limited to, immediate disclosure, contempt proceedings, . . . continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) "The court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States." (*Id.*, subd. (c).) "Section 1054.5, subdivision (c) preserves judicial power to dismiss charges for a *Brady* violation." (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 352, citing *People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1214 [federal Constitution did not require dismissal of the case where there was no *Brady* violation].)

C.   *Analysis*

The court determined Ricks did not have his discovery rights violated by the late disclosure of the cooperation agreement. We agree. The agreement was for the inmate to provide information on the codefendants in her own case in exchange for a reduced charge and sentence. There is no evidence the inmate received any additional benefit for providing evidence about the statements Holmes made to her while the two were in custody together. Ultimately, the materiality inquiry is whether " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " (*Strickler, supra*, 527 U.S. at p. 290.) Because all the evidence pertaining to the inmate was ultimately disclosed during trial and presented to the jury, we see no basis to conclude

that the failure to disclose it any earlier put the case in such a different light as to undermine confidence in the verdict.

"Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery. [Citations.]" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467.) Ricks made full use of the inmate's agreement at trial. Not only was the evidence admitted, but both parties discussed it extensively during argument. Defense counsel urged the jury to look at the agreement and argued that her potential exposure of 25 years to life plus two years was hanging over her head, and she wanted to take advantage of the deal to obtain a more favorable sentence.

For similar reasons, we reject Ricks's contention that the prosecution violated section 1054.1, which requires the prosecutor to disclose, among other things, "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" that is "in the possession of the prosecuting attorney" or known by the prosecuting attorney "to be in the possession of the investigating agencies." (§ 1054.1, subd. (c).) The evidence in question—the informant's cooperation agreement in her own case—was not seized or obtained as a part of the investigation of the offenses charged against Ricks. And even if Ricks could demonstrate a violation of section 1054.1, it would be subject to the harmless-error standard set forth in *Watson, supra*, at page 836. (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.) Under *Watson*, an error is prejudicial only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) Because the jury heard all the evidence, there is no reasonable probability of a different result and any section 1054.1 error by the prosecution would be harmless.

21

We conclude the trial court correctly determined there was no violation of Ricks's constitutional or statutory discovery rights.

IV.

*Prosecutorial Misconduct*

Ricks contends the prosecutor committed misconduct by eliciting gang-related testimony in violation of the court's pretrial ruling excluding such evidence.

A.   *Additional Factual Background*

Before trial, the court granted Ricks's motion to exclude evidence related to gang affiliation or involvement.  No evidence was presented about gang affiliation, but there were several references to gang units, teams, detectives and task forces during the trial.

For example, in response to defense counsel's questions about a vehicle in a photograph, an officer responded that the car was a police department "Detective Bureau Crown Victoria, possibly the gang detail."  Similarly, a district attorney investigator testified he "reached out to the district attorney's office gang impact team to assist" his efforts to secure witness Holmes for her appearance in court.  Another officer testified that it was common for a gang detective to help with a homicide investigation because of their level of experience as a police officer in general.  He testified that Holmes was a person of interest and she was known to him because he had previous contacts with Holmes as a gang detective.  He arrested Ricks with the assistance of the gang impact team and the Hemet Police Department. He and the gang team checked front and back yards near where they were looking for Holmes and Ricks.

Ricks did not object, move to strike the evidence or request a curative instruction.  Later, defense counsel moved for a mistrial based on the officer's

references to gangs. The court denied the motion, pointing out the context in which gangs were mentioned was limited to evidence that the gang impact team and another police department were called in to assist. Ricks filed a motion for a new trial based in part on the eliciting of "gang evidence" by the prosecution. Defense counsel filed a declaration citing the jury's post-verdict safety concerns as evidence that the jurors were concerned about gang affiliation. The motion was denied.

B. *Analysis*

" '[T]o preserve a claim of prosecutorial misconduct for appeal, " ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety." ' [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm." [Citation.]' " (*People v. Lima* (2022) 80 Cal.App.5th 468, 478.) Here, Ricks "failed to object and request an admonition regarding [the prosecution's closing] comments at trial. Nothing in the record suggests that an objection would have been futile or that an admonition would have failed to cure any harm. We conclude, therefore, that defendant forfeited his challenges to these comments." (*People v. Adams* (2014) 60 Cal.4th 541, 575.)

Were we to overlook the forfeiture, we would reject the claim on the merits. " ' "It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony' " ' " (*People v. Trinh* (2014) 59 Cal.4th 216, 248), but such misconduct is not always prejudicial (*id.* at p. 249). Here, some of the challenged evidence was elicited by defense counsel, and the passing references to law enforcement's specialized gang assignments did not violate the court's order excluding evidence of gang affiliation. The prosecutor did not elicit evidence of gang involvement or affiliation by Ricks or anyone else

in violation of the trial court's ruling.  The pretrial order did not forbid any and all references to the word "gang" or the gang impact team or gang detectives.  No testimony was presented regarding gangs, gang colors, or gang activities by Ricks or any other witness.  The isolated references to the gang impact team or gang detectives therefore did not constitute misconduct and did not demonstrate "an egregious pattern of conduct that rendered the trial fundamentally unfair in denial of [Ricks's] federal constitutional right to due process of law."[4]  (*People v. Smithey* (1999) 20 Cal.4th 936, 961.)

V.

*Constitutionality of the "Drive-By" Special Circumstance*

Ricks challenges the constitutional validity of section 190.2, subdivision (a)(21), otherwise known as the "drive-by" special circumstance for murder, as overinclusive on its face and as applied in this case.[5]  The jury's true finding on this special circumstance resulted in a sentence of life without possibility of parole.  In particular, Ricks argues the provision

---

[4]     Because we find no misconduct, we also reject Ricks's related claim that defense counsel was ineffective for failing to object to the alleged misconduct.

[5]     The drive-by special circumstance provides:

"(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:

[¶] . . . [¶]

"(21) The murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death.  For purposes of this paragraph, 'motor vehicle' means any vehicle as defined in Section 415 of the Vehicle Code." (§ 190.2, subd. (a)(21).)

24

violates substantive due process because it reaches conduct that does not rationally relate to the purpose of the statutory provision and it is overinclusive. He further argues it runs afoul of the Eighth Amendment because it includes conduct such as spontaneous and unpremeditated murder that does not warrant eligibility for death or life imprisonment without the possibility of parole. In his view, section 190.2, subdivision (a)(21) penalizes a factual characteristic of an offense, being in a vehicle, which is not necessarily related to culpability, resulting in more severe punishment for what might otherwise be treated as second-degree murder.

He also challenges this special circumstance as unconstitutionally vague because it fails to distinguish between a shooting from a vehicle that results in first degree murder (§ 189) and the type of discharge of a firearm from a vehicle that qualifies a defendant for death or life without the possibility of parole, thereby risking arbitrary and prejudicial enforcement.

A. *Forfeiture*

Ricks did not challenge the drive-by special circumstance (§ 190.2, subd. (a)(21)) in the trial court. Ordinarily, a defendant who does not raise a claim in the trial court forfeits their right to assert the claim on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) An exception to the rule, however, allows consideration of a defendant's assertion that a statute is facially unconstitutional as a purely legal issue that does not require review of the trial record. (*Id.* at p. 889; *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9 ["Notwithstanding this rule of forfeiture, courts generally consider constitutional challenges to penal statutes for the first time on appeal where, as here, the arguments are legal, based on undisputed evidence, and center on review of abstract and generalized legal concepts"].) Accordingly, we will consider only Ricks's facial challenges to the

constitutionality of section 190.2, subdivision (a)(21), as failure to object forfeits any as-applied challenge. (*Sheena K.,* at pp. 887–889.)

B.  *Overbreadth*

Ricks contends the drive-by special circumstance is overinclusive and unconstitutional under the due process clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment. These same constitutional challenges were exhaustively discussed and rejected 27 years ago in *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166–181.  No court has questioned *Rodriguez* or the constitutional validity of this special circumstance in the intervening decades.  We agree with *Rodriguez* and adopt its reasoning and holding as our own.

C.  *Vagueness*

Alternatively, Ricks mounts a facial attack on section 190.2, subdivision (a)(21) on the grounds that it is unconstitutionally vague.  He contends section 190.2, subdivision (a)(21) is impermissibly vague because it results in a sentence of death or life without parole for conduct that is indistinguishable from the statutory theory of first-degree murder for a killing "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict

death" (§ 189, subd. (a)),[6] which carries a life sentence *with* the possibility of parole. Absent any meaningful distinction between the criteria necessary to satisfy the drive-by special circumstance and the parallel theory of first degree drive-by murder, Ricks argues the special circumstance statute risks arbitrary and prejudicial imposition of death or life without the possibility of parole.

In his opening brief, Ricks acknowledges that we "rejected a similar vagueness challenge to the felony-murder special circumstance in the case of *People v. Andreasen* (2013) 214 Cal.App.4th 70." That case involved a fatal stabbing in a parking lot resulting in a judgment convicting Andreasen of first degree murder, with a special circumstance finding of murder during the commission of the attempted robbery. (*Id.* at pp. 73–74.) Andreasen was sentenced to life without the possibility of parole. (*Id.* at p. 79.) On appeal, Andreasen argued the special circumstance enhancement was unconstitutionally vague because, "as applied to the actual perpetrator of the killing (who need not have the intent to kill), the special circumstance [was] indistinguishable from the felony-murder offense, which imposes a life sentence *with* the possibility of parole when there is no special circumstance finding." (*Ibid.*) As a result, he "posit[ed] this create[d] a constitutional

---

[6] Section 189 provides: "(a) All murder that is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or that is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 287, 288, or 289, or former Section 288a, or murder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (§ 189, subd. (a).)

infirmity because the prosecutor had 'unfettered discretion' to select the charge, and defendant had no way of anticipating whether he would be subjected to the possibility of death or life in prison without the possibility of parole, rather than life with the possibility of parole." (*Ibid*.)

In rejecting this vagueness argument, we reasoned that the statutes "provided [the] defendant with notice that if he commits a statutorily-specified felony and kills someone during that felony, he could be subjected to a sentence of 25 years to life with the possibility of parole, life without parole, or death.  [The d]efendant had notice as to the proscribed conduct and potential punishment.  The mere fact that the prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute."[7]  (*Andreasen, supra*, 214 Cal.App.4th at p. 80; accord *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1028 (*Montelongo*).)

In *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, the defendant likewise challenged the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) as unconstitutionally vague because it was similar to the lying-in-wait theory of first degree murder (§ 189, subd. (a)).  (*Bradway,* at pp. 306–311.)  In rejecting the challenge, *Bradway* explained:  "Generally, there are two separate and distinct legal theories for challenging a statute on

_____

[7]     As an additional ground for our holding in *Andreasen*, we concluded "even assuming arguendo that constitutional due process requires a distinction between the felony-murder offense and the felony-murder special circumstance [citations], there is such a distinction" because "the felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing."  (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 80 (*Andreasen*).)

vagueness grounds, depending on the interests at stake. [Citation.] A person challenging aggravating circumstance statutes in death penalty cases bring such under the Eighth Amendment, asserting 'the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with . . . open-ended discretion . . . .' [Citation.] In noncapital cases, the challenge comes under the due process clause and 'rest[s] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.' " (*Id*. at p. 309.)

Similar to *Andreasen*, the first degree murder and drive-by special circumstance statutes at issue here provide noncapital defendants with fair notice that if they intentionally discharge a firearm from a motor vehicle with the intent to kill a person outside the vehicle, resulting in death, they could be subjected to a sentence of either 25 years to life with the possibility of parole or life without the possibility of parole. These provisions "unambiguously specify the activity proscribed and the penalties available upon conviction. . . . So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." (*United States v. Batchelder* (1979) 442 U.S. 114, 123.) In the noncapital context at least, the fact that prosecutors have discretion to select which form of life imprisonment to seek for a drive-by murder does not render the statutory scheme unconstitutionally vague or arbitrary. (See *Montelongo*, *supra*, 55 Cal.App.5th at p. 1028; see also *Batchelder*, at pp. 122–126 [no due process or equal protection violation arising from prosecutor's discretion to charge the defendant under a statute imposing a penalty that was harsher than that imposed by another statute proscribing precisely the same conduct].) We

29

therefore reject Ricks's vagueness challenge to the drive-by special circumstance.

## VI.

### *Remand for Resentencing*

Ricks contends the matter should be remanded to give the court an opportunity to strike the section 12022.53, subdivision (d) enhancement and impose a lesser firearm enhancement. We agree.

In *McDavid*, *supra*, 15 Cal.5th 1015, the California Supreme Court held that:

> [W]hen a court has exercised its discretion under subdivision (h) to strike a section 12022.53 enhancement and finds that no other section 12022.53 enhancement is appropriate, the second sentence of subdivision (j) is inapplicable and does not bar the court from imposing a lesser included, uncharged enhancement under a law other than section 12022.53. The court thus has discretion to impose such an enhancement if it is supported by facts that have been alleged and found true.

(*McDavid*, *supra*, 15 Cal.5th at p. 1030, citing *People v. Tirado* (2022) 12 Cal.5th 688, 699 (*Tirado*).)

" ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424 (*Salazar*).) " 'In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Ibid.*) "A court acting while unaware of the full scope of its discretion is

30

deemed to have abused it." (*McDavid, supra*, 15 Cal.5th at p. 1023, citing *Tirado, supra*, 12 Cal.5th at p. 694.)

Ricks was sentenced before the Supreme Court filed its decision in *McDavid*. Consequently, the trial court did not have the benefit of *McDavid*'s clarification of the law and its holding that lower courts have the discretion to impose "a lesser included, uncharged enhancement under a law other than section 12022.53." (*McDavid, supra*, 15 Cal.5th at p. 1030.) In this circumstance, remand is required unless the record clearly indicates the court would have reached the same decision even if it had been aware of its discretion. (*Salazar, supra*, 15 Cal.5th at p. 431.) The record here lacks any such indication. Accordingly, we must reverse and remand for resentencing so that the court can exercise informed discretion. We express no view how the trial court should exercise its discretion on remand.

As a result, we need not address Ricks's other sentencing arguments. These issues are rendered moot under the full sentencing rule and are not appropriate for appellate resolution at this time. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)

## DISPOSITION

The sentence is reversed, and the matter is remanded for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.